**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON, a federally recognized Indian tribe,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No. 02-126L<br>Judge Susan Braden |

**STIPULATED MOTION TO DISMISS FIRST CLAIM FOR RELIEF PURSUANT TO SETTLEMENT AGREEMENT AND [PROPOSED] ORDER**

Effective September 26, 2006, the parties have executed a written Stipulation and Agreement For Compromise, Settlement, and Release and [Proposed] Order ("Settlement Agreement"), settling the Plaintiff's First Claim For Relief contained in its Second Amended Complaint and resolving the Plaintiff's claim for an historical accounting of trust funds in The Confederated Tribes of the Warm Springs Reservation v. Kempthorne et. al, United States District Court For The District of Columbia, Case No. 02CV2040 (RCL). The parties have filed the Settlement Agreement with the District Court, and the Court entered the Settlement Agreement as an Order on October 23, 2006. A copy of the Settlement Agreement, without Exhibit D, which has been filed under seal with the District Court, is attached.



W1510.0\277049

Pursuant to Section 9 of the Settlement Agreement, Plaintiff moves the Court to dismiss the First Claim For Relief (Breach of Trust Duty--Trust Funds Mismanagement) of the Second Amended Complaint. In accordance with Section 9 of the Settlement Agreement, Plaintiff seeks dismissal of the First Claim For Relief with prejudice and without costs.

Respectfully submitted this 2nd day of November, 2006.

KARNOPP PETERSEN LLP

Michael L. Dillard, OSB# 86010
mld@karnopp.com
Karnopp Petersen LLP
1201 NW Wall Street
Bend, OR 97701
TEL: (541) 382-3011
FAX: (541) 383-3073
Attorney of Record for Plaintiff

**STIPULATION**

Defendant stipulates to the above-motion and to the entry of the Order set forth below.

SUE ELLEN WOOLRIDGE
Assistant Attorney General

By John Martin, Attorney Of Record For Defendant
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
Date: 3 Nov 2006

**ORDER**

The Court HEREBY ORDERS AS FOLLOWS:

1. Plaintiff's First Claim For Relief contained in the Second Amended Complaint is dismissed with prejudice and without costs.

HONORABLE SUSAN G. BRADEN
United States Court of Federal Claims

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2006, a copy of the foregoing Stipulated Motion to Dismiss First Claim for Relief Pursuant to Settlement Agreement and [Proposed] Order was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ John H. Martin*
John H. Martin
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
1961 Stout Street, 8th Floor
Denver, CO 80294
Tel: (303) 844-1383
Fax: (303) 844-1350
john.h.martin@usdoj.gov
Attorney for Federal Defendants

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON,

Plaintiff,

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR, DAVID W. ANDERSON, ASSISTANT SECRETARY OF INDIAN AFFAIRS, JOHN W. SNOW, SECRETARY OF THE TREASURY,

Defendants.

Case No. 02CV2040 (RCL)

**STIPULATION AND AGREEMENT FOR COMPROMISE, SETTLEMENT AND RELEASE AND [PROPOSED] ORDER**

This Stipulation and Agreement for Compromise, Settlement and Release and [Proposed] Order (the "Agreement") is made and entered into on this 26th day of September 2006 by and between the Confederated Tribes of the Warm Springs Reservation of Oregon (referred to hereinafter as the "Tribe"), on the one side, and the United States of America, the United States Departments of Interior and Treasury, the Secretaries of the Departments of Interior and Treasury, and the Interior Assistant Secretary of Indian Affairs on the other side (referred to hereinafter collectively as the "United States"). The Tribe and the United States (referred to hereinafter collectively as the "Parties") stipulate and agree as follows.

## RECITALS

1. The Parties are currently engaged in the following lawsuits:

A. Confederated Tribes Of The Warm Springs Reservation of Oregon v. United States, Case No. 02-126L (C.F.C.) ("C.F.C. Case")

B. Confederated Tribes Of The Warm Springs Reservation of Oregon v. Norton et al, Case No. 02-CV-02040 (D.D.C) ("D.D.C. Case").

The C.F.C. Case is an action for money damages that the Court has bifurcated into two phases: Phase I covers the Tribe's trust funds mismanagement claim, and Phase II covers the Tribe's non-monetary asset mismanagement claim, as each of those two claims are set forth in the Tribe's Second Amended Complaint, filed August 26, 2004, attached hereto as Exhibit A. The D.D.C. Case is an action for injunctive relief that seeks a court-ordered historical accounting of the Tribe's trust funds and assets.

2. Since the Fall of 2004, the Parties have been engaged in an alternative dispute resolution ("ADR") process regarding Phase I of the C.F.C. Case and the D.D.C. Case. In that process, the Parties engaged in productive discussions, exchanged significant information and financial data, and interviewed certain individuals. This ADR process was intended to address all of the Tribe's claims in Phase I of the C.F.C. Case as well as the monetary trust funds historical accounting claim in the D.D.C. Case.

3. A primary element of the ADR process was the Parties' development and implementation of Agreed Upon ADR Methodologies to analyze and quantify the amounts in dispute for the Tribe's claims in Phase I of the C.F.C. Case. By agreeing to develop and implement the specified ADR Methodologies, the parties did not thereby agreed to adopt or accept as binding the results obtained using the Agreed Upon ADR Methodologies. As a part of the ADR process, the United

States and the Tribe also executed a Cooperative Agreement in May 2005, which provided $250,000 in federal funding to the Tribe to support its involvement in the development and implementation of the Agreed Upon ADR Methodologies.

4. The Parties have negotiated the Agreement Governing ADR Proceedings attached hereto as Exhibit B. Although the parties have not executed the Agreement Governing ADR Proceedings, the parties have completed the process described therein, including the United States' satisfactory performance of the accounting methodologies regarding the Tribe's monetary trust funds (which are attached as Exhibit 1 to the Agreement Governing ADR Proceedings), and the Tribe's testing and monitoring of that performance.

5. On December 14 & 15, 2005, and on January 25 & 26, 2006, in Portland, Oregon, the Parties participated in a joint settlement conference regarding the D.D.C. Case and Phase I of the C.F.C. case which resulted in a proposed combined settlement of the D.D.C. Case and Phase I of the C.F.C. case. On January 26, 2006, the Tribal Council of the Confederated Tribes of the Warm Springs Reservation of Oregon approved the proposed terms of the combined settlement, subject to approval of a written settlement agreement.

6. For purposes of this Agreement, the Tribe's monetary trust funds (hereinafter referred to as "Trust Funds") includes all monetary funds held in trust by the United States, including any and all: monetary trust assets, income, funds held on deposit, invested funds, any Tribal-related monetary funds accounts that are established pursuant to federal legislation and that are maintained, managed, invested, or controlled by either Interior or Treasury, any proceeds-of-labor accounts; Tribal individual Indian money accounts; special deposit accounts; Treasury accounts (principal and interest); legislative settlement or award accounts, or judgment accounts. For the avoidance of doubt, it is the intention, understanding, and agreement of the Parties that non-monetary trust assets are, for purposes of this Agreement, separate and distinct from the

monetary trust funds that are derived from the sale, lease or use of non-monetary trust assets, whether such Trust Funds are denominated as trust monies, trust accounts, or trust account balances.

7. This Agreement is in the public interest. The Parties share a mutual interest in resolving costly and complex disputes that have been ongoing for four years and center on events occurring over the course of decades. The Parties also share a mutual interest in not incurring substantial expense and uncertainty to the public, the United States, and the Tribe in litigating over an accounting of Trust Funds or claims of monetary trust funds mismanagement.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:**

1. Compromise and Settlement. This Agreement is the result of compromise and settlement between the Parties for the purpose of compromising disputed claims and avoiding the expense and risks of further litigation. This Agreement is not, is in no way intended to be, and should not be construed as, an admission of liability or fault on the part of the United States, its agencies, its agents, servants, or employees, and it is specifically denied that they are liable to the Tribe.

2. Cooperative Agreement. Within fourteen days of the entry of this stipulation as an Order, the Department of the Interior and the Tribe will execute a Cooperative Agreement, substantially in the form attached hereto as Exhibit C, providing additional funding up to $115,000 by the United States to the Tribe for the purpose of reimbursing the Tribe for certain of the Tribe's costs in testing and monitoring the performance of the Agreed Upon ADR Methodologies and providing the reports specified in the Cooperative Agreement.

3. Payment of Settlement Amount. The United States agrees to pay to the Tribe the sum of Twenty Million Dollars ($20,000,000.00) (the "Settlement Amount") as a compromise

settlement pursuant to the authority provided by 28 U.S.C. §§ 516 & 2414, which sum shall be in full, complete and final settlement and satisfaction of all claims released below in Paragraph Four (4) and adequate consideration for the other obligations herein. It is not the intent of the parties to have the entry of this Agreement as an order constitute a judgment, and such order shall not be construed as a judgment.

4. Mutual Release.

A. Except for the obligations and reservations contained in this Agreement, the Tribe and the United States hereby mutually, irrevocably and unconditionally release, forever discharge, waive, and covenant not to sue each other and each of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns, for and from any and all claims and liabilities of any kind or nature whatsoever, known or unknown, suspected or unsuspected, regardless of legal theory, for any damages, equitable or specific relief, based on facts occurring before the date of the Court's entry of this Joint Stipulation of Settlement as an Order, and which arise from either: (i) the United States' obligation to provide an accounting of the Tribe's Trust Funds, and Defendants' fulfillment of such obligation, (ii) the United States' alleged mismanagement of the Tribe's Trust Funds, or (iii) the United States' alleged failure to perform any legal obligation owed to the Tribe regarding the management of Trust Funds, including but not limited to any claims for mismanagement of Trust Funds that arise from the law cited in paragraphs 4 and 5 of the Second Amended Complaint in the C.F.C. Case or the Tribe's first claim for relief in that Complaint, attached as Exhibit A.

B. The scope of this release includes any and all claims that the United States breached its obligation, through the Effective Date of this Agreement, to perform an historical accounting of the Trust Funds of the Tribe or otherwise: (i) to account for the daily and annual balance of all

funds held in trust by the United States for the Tribe deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. § 162a) as may be required by 25 U.S.C. §§ 162a or 4011 or other law; (ii) to report to the Tribe regarding all collections, disbursements, investments, and return on investments related to its accounts, as may be required by 25 U.S.C. § 4043 or other law; and (iii) to reconcile Tribal and individual Indian money accounts in which the Tribe has an ownership interest, as may be required by 25 U.S.C. §§ 4043 or 4044 or other law.

5. Attestation as to Account Balances. The Tribe accepts the Statements of Performance issued by the Office of the Special Trustee for American Indians (OST) of the Department of the Interior for the period ending December 31, 2005, as accurate and a full, true and correctly stated account. The balances for the Tribe's trust fund accounts shall be as stated in the Statements of Performance issued by OST for the period ending December 31, 2005 (attached hereto as Exhibit D).

6. Attestation and Waiver of Certain Future Claims.

A. Attestation regarding periodic Statements of Performance. The Tribe and the United States agree that the United States has no responsibility under present applicable federal statutes and regulations to account for and report to the Tribe regarding the Tribe's Trust Funds except for the requirements of the American Indian Trust Fund Management Reform Act of 1994, P.L. 103-412, 108 Stat. 4238 (hereinafter the "Reform Act of 1994"), and any regulations adopted thereunder.

(1) In satisfaction of its reporting responsibilities under Section 102 of the Reform Act of 1994 (codified in 25 U.S.C. § 4011) the United States presently provides the Tribe with the following:

(a) a periodic Statement of Performance on a quarterly, or upon request monthly, basis for all of the Tribe's trust funds held in trust pursuant to the Act of June 24, 1938 (25 U.S.C. § 162a), in the form attached to herein as Exhibit D. Conditional on the United States continuing to provide the Tribe with these reports, the Tribe attests that delivery of the foregoing satisfies the present reporting requirements of Section 102 of the Reform Act of 1994 (codified in 25 U.S.C. § 4011).

(b) a letter, on an annual basis, that relates to the United States' annual audit of all funds held in trust for the benefit of Tribes pursuant to the Act of June 24, 1938 (25 U.S.C. § 162a).

(2) In satisfaction of its reporting responsibilities under Section 303 (b)(2)(B)(ii) of the Reform Act of 1994 (codified in 25 U.S.C. § 4043 (b)(2)(B)(ii)), the United States presently provides the Tribe with periodic Statements of Performance which contain a report of the Tribe's trust fund investments and return on those investments, in the form attached hereto as Exhibit D. Conditional on the United States continuing, at a minimum, to provide the Tribe with these reports, the Tribe attests that delivery of the foregoing satisfies the present requirements of Section 303 (b)(2)(B)(ii) of the Reform Act of 1994 (codified in 25 U.S.C. § 4043 (b)(2)(B)(ii)).

(3) The Tribe desires to compare the yield of the Tribe's investments with the yields on other investment securities the Department of the Interior may purchase for the Tribe's Trust Funds under applicable federal law (the "Authorized Investments"). The parties acknowledge that such comparative yield information is available from sources believed to be accurate and equally available to both parties. These sources include publicly available print or online publications, such as *The Wall Street Journal*, *The New York*

*Times*, *The Washington Post*, *USA Today* and their respective websites; other subscription or free websites, such as bondpage.com, bondtrac.com, investinginbonds.com, tradebonds.com, and zionsbank.com; and subscription services such as Bloomberg, Lehman Brothers, and Merrill Lynch. These sources are named by means of example only, and the United States does not endorse or recommend any of the above-listed publications or subscription services. Further, investment strategy is a proper subject for discussion between the Tribe and Department of the Interior pursuant to 25 C.F.R. Part 115.

B. Required notice of objections regarding information in future Periodic Statements of Performance. After the date of the Court's entry of this Joint Stipulation of Settlement as an Order, the following provisions shall apply:

(1) Any objections that the Tribe has regarding the completeness or accuracy of information reported in a periodic Statement of Performance must be presented in writing within fifteen (15) months after the close of the calendar year in which the reported period occurs or fifteen (15) months after the Statement of Performance is delivered to the Tribe, whichever is later. The written objection shall include a reasonably particular description of the grounds for the objection. The written objection shall be presented to the Department of the Interior, by U.S. certified mail, at the following address:

United States Department of the Interior
Office of the Special Trustee for American Indians
4400 Masthead, N.E.
Albuquerque, NM 87109
Attn: Director of the Office of Trust Review and Audit

with a copy of the written objection provided to the Northwest Regional Director of the Northwest Regional Office of the Bureau of Indian Affairs. Within 60 days after

receiving the Tribe's written objection, the Department of the Interior will: (a) provide the Tribe with a revised Statement of Performance, (b) explain why the original Statement of Performance was correct, or (c) advise the Tribe that additional time is needed to respond thereto.

(2) The Tribe's authorizing officials are entitled to request additional information regarding its trust accounts at any time. The Tribe agrees to designate authorizing official(s) by Tribal Resolution, and to notify the Department of the Interior in writing of any new designation when said authorizing officials change. The United States shall make all reasonable efforts to provide the Tribe with the requested information, including making Department of the Interior personnel available to the Tribe for questions, within thirty (30) days of the date of receipt of such request.

(3) The information reported in a periodic Statement of Performance delivered by the Department of the Interior to the Tribe, to which no objection in writing is made to the Department of the Interior within fifteen (15) months after the close of the calendar year in which the reported period occurs or fifteen (15) months after the Statement of Performance is delivered to the Tribe, whichever is later, shall be conclusively presumed to be accurate and correct. A failure by the Tribe to make a timely written objection to information reported in a periodic Statement of Performance shall have no other legal effect or consequence except for this conclusive presumption and the conditional waivers of certain claims set forth in the following subparagraph (C); and this limitation of legal effect shall not apply to other acts and omissions of the parties with regard to any future claims or defenses of the Parties.

C. Conditional Waiver of Certain Claims and Covenant Not to Sue.

The following conditional waiver and covenant not to sue applies to possible future "Lag Time Claims", "Disbursement Claims" and "Productivity Claims", as those Phase I monetary trust funds mismanagement claim categories are described in Exhibit 1 to the Agreement Governing ADR Proceedings, attached hereto as Exhibit B. Such claims are hereinafter referred to as the "Future Lag Time, Disbursement and Productivity Claims." Excepting claims of fraud or gross negligence, the Tribe conditionally waives and covenants not to sue the United States, its agencies, agents or employees, for Future Lag Time, Disbursement and Productivity Claims, arising out of the management of the Tribe's monetary trust funds for a particular calendar year, if the Tribe does not first present an objection in writing to the Department of the Interior as specified in Paragraph 6(B)(1), regardless of any other superseding procedure as referred to in subparagraph 6(D) herein. This waiver and covenant not to sue is conditioned on the United States continuing in the future, at a minimum, to provide the Tribe with the reports specified above in subparagraph 6(A)(1) and 6(A)(2)

D. Procedures Superseded by Formal Regulation or Act of Congress.

The parties recognize and agree that nothing in this Agreement has the effect of altering existing federal laws or regulations governing the relationship and dealings between the Tribe and the United States. The parties agree that the provisions of Sections 6(B), except as specified in subparagraph 6(C), shall remain in effect only until the promulgation of regulations pursuant to 5 U.S.C. § 553 or the enactment of an Act of Congress which provides a different procedure for the Tribe to submit objection to

information contained in reports provided by the United States regarding the Tribe's funds held in trust by the United States for the Tribe pursuant to the Act of June 24, 1938 (25 U.S.C. § 162a). If such regulations are promulgated or such act of Congress is enacted, the applicable federal law or regulations shall supersede subparagraph 6(B) herein and such section shall no longer be of any force or effect except as specified in subparagraph 6(C). It is hereby acknowledged that it is the Tribe's position that the Tribe's agreement to the procedures set forth in section 6. A through C should not be used in the future by the United States as a precedent for seeking the enactment of statutes or the adoption of regulations imposing similar procedures upon other Indian tribes which may or may not be in a position to operate successfully under such procedures.

7. Confidentiality. The parties incorporate and agree to be bound by Section VIII. of the Agreement Governing ADR Proceedings, entitled "Confidentiality Agreement Provisions." Pursuant to Section VIII. F. of the Agreement, on January 20, 2006, the parties filed in the C.F.C Case a proposed Stipulated Protective Order Re Confidentiality of ADR-Mediation Communications. The C.F.C. Court has not entered that order. The parties agree to cooperate and renew their request that the C.F.C. Court enter the stipulated protective order.

8. Dismissal of D.D.C. Case. Within fourteen days after the Court's entry of this Joint Stipulation of Settlement as an Order, the Tribe will file a motion to dismiss the D.D.C. Case as follows: (i) The dismissal shall be with prejudice with respect to the Tribe's equitable or legal claim against the United States for an historical accounting of monetary trust funds, including any alleged violations by the United States and its agencies and officials of the statutes and laws cited in paragraph 4 above; (ii) The motion to dismiss shall be without prejudice with respect to

all other claims including the Tribe's equitable or legal claims against the United States for an historic accounting of non-monetary trust assets.

9. Partial Dismissal of the C.F.C. Case. Within fourteen days after entry of this Joint Stipulation of Settlement as an Order, the Tribe shall file a motion to dismiss its First Claim for Relief in its Second Amended Complaint in the CFC Case with prejudice and without costs.

10. Reservation of claims regarding non-monetary trust assets. The claims dismissed with prejudice and released in this Agreement do not include any damage claims that the Tribe may have against the United States for breach of any fiduciary duty in managing the Tribe's non-monetary trust assets, including but not limited to the Tribe's claims in its Second Claim for Relief in the C.F.C. Case or for an historical accounting of non-monetary trust assets. However, with respect to such excluded claims, the Tribe agrees not to seek any remedy for such claims that would require the United States to provide an historical accounting for monetary trust funds, including but not limited to an historical accounting for balances, credits, debits, receipts, disbursements, investments, or return on investments related to trust accounts and the monies contained therein.

11. Dispute Resolution. If there is a dispute over compliance with any term or provision of this Agreement, the disputing Party will notify the other Party in writing of the dispute. The Parties will attempt to work out the dispute informally before seeking judicial review by this Court. The disputing Party will engage the other Party in informal dispute resolution. During this informal dispute resolution period, which will not exceed 90 days (unless the Parties agree to an extension of the period), the Parties will meet as many times as both deem necessary to discuss and attempt to resolve the dispute. If the Parties are unable to resolve the dispute through informal dispute resolution, either Party may file a motion asking that this Court enforce the relevant term(s) and

provision(s) of this Agreement. The Parties stipulate and agree that the U.S. District Court for the District of Columbia shall retain jurisdiction to interpret and enforce this Settlement Agreement.

12. Remedy for non-payment. No term or provision of this Agreement will constitute or will be construed as a commitment or a requirement that the United States obligate or pay funds in contravention of the Antideficiency Act, 31 U.S.C. § 1341, and any other applicable law or regulation. If the United States is unable to perform its obligations under this Agreement because such payment is deemed to be in contravention of the Antideficiency Act, 31 U.S.C. § 1341, or any other applicable law or regulation, then this Agreement shall be deemed a nullity and the release and dismissals provided by the Tribe will be void.

13. Attorneys' Fees. Each Party shall be responsible for its own attorney's fees and costs incurred in the C.F.C. Case or the D.D.C. Case through the dates of the dismissals referenced above in paragraphs 8 and 9.

14. Governing Law. This Agreement shall be governed by the laws of the United States.

15. All Writings Contained Herein. This Agreement and attachments contain the entire agreement between the Parties concerning the terms of settlement, and there are no other agreements concerning such settlement except as set forth or incorporated by reference herein. No subsequent modifications or amendments of this Agreement shall be of any force or effect unless in writing, signed by the authorized representatives of the Parties.

16. Additional Documents. The Parties agree to execute and if necessary file with a court such additional documents as may be necessary to carry out the terms of this Agreement.

17. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties' respective successors, transferees and assigns.

18. Headings Not Controlling. The section, paragraph, and subparagraph headings included herein are for reference only and are not a part of this Agreement. The headings shall not control or alter the meaning of this Agreement as set forth in the text.

19. Informed Consent. The Parties agree that this Agreement was negotiated in good faith and that the Parties were represented by competent counsel throughout the settlement negotiations leading up to and including the final execution of the Agreement. The Parties further agree that, prior to executing the Agreement, they were fully informed of the contents and consequences of the Agreement by their respective counsel and that each Party independently concluded that entering into the Agreement was a fair and reasonable disposition of the legal disputes described herein.

20. Approvals Obtained. The required approvals to enter into, and to execute this Agreement have been obtained from the Parties. The Parties now desire to amicably complete the settlement of the described claims and enter into this Agreement for that purpose.

21. Execution of the Agreement. Each of the signatories hereto hereby represents and warrants that he or she has the right, power, legal capacity and authority to execute into this Agreement and to bind the entity he or she represents to this Agreement and the obligations hereunder.

22. Effective Date. This Agreement shall become effective upon the date when execution of both parties has occurred. The party which executes last shall enter such Effective Date in the date space provided for in the first sentence of this Agreement.

EXHIBITS

Exhibit A: C.F.C. case Second Amended Complaint, filed August 26, 2004

Exhibit B: Agreement Governing ADR Proceedings, including ADR Methodologies

Exhibit C: Cooperative Agreement

Exhibit D: Statements of Account ending Dec. 31, 2005, for month of December

THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON

By: Stanley Buck Smith

Its: Vice-Chairman for Chairman of Tribal Council

Date: 5-31-2006

THE UNITED STATES OF AMERICA

By: [signature]

Its: Counsel of Record for the United States

Date: 26 Sept 2006

**APPROVED AS TO FORM:**

KARNOPP PETERSEN LLP

By Michael L. Dillard

Attorneys for The Confederated Tribes of the
Warm Springs Reservation of Oregon and

Date: June 5, 2006

SUE ELLEN WOOLRIDGE
Assistant Attorney General

By John H. Martin
United States Department of Justice
Environment and Natural Resources Division
Natural Resource Section

Date: 26 SEPT 2006

Respectfully submitted this October 17, 2006.

SueEllen Wooldridge
Assistant Attorney General

John H. Martin
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resource Section
1961 Stout Street, Suite 800
Denver, CO 80292
john.h.martin@usdoj.gov

Attorney for the Defendants

Karnopp Petersen LLP

Michael L. Dillard
Karnopp, Petersen LLP
1201 NW Wall Street, Suite 300
Bend, OR 97701-1957 (tel.)
(541) 382-3011 (fax)
(541) 388-5410
mld@karnopp.com

Attorney for the Plaintiff

**[PROPOSED] ORDER**

ENTERED as an Order of this Court, on this ______ day of ____________, 2006.

HON. ROYCE C. LAMBERTH
United States District Judge

## Certificate of Service

I hereby certify that on 17 October 2006 a copy of the foregoing **STIPULATION AND AGREEMENT FOR COMPROMISE, SETTLEMENT AND RELEASE AND [PROPOSED] ORDER** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ John H. Martin*
John H. Martin
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
1961 Stout Street, Suite 800
Denver, CO 80292
Tel: (303) 844-1383
Fax: (303) 844-1350
john.h.martin@usdoj.gov
Attorney for Defendants

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 02-126L<br>Judge Susan Braden |

SECOND AMENDED COMPLAINT

Plaintiff, by and through its undersigned attorney, for its second amended complaint, hereby alleges as follows:

NATURE OF ACTION

1. This is an action by Plaintiff, the Confederated Tribes of the Warm Springs Reservation of Oregon ("Plaintiff", the "Warm Springs Tribe" or the "Tribe"), seeking money damages against Defendant United States of America ("Defendant" or the "United States") for breaches of trust duties in regard to the management by Defendant of the trust funds and non-monetary assets of the Warm Springs Tribe from 1855 to present. This action arises out of Defendant's breach of constitutional, statutory, regulatory, and common law trust duties owed to the Tribe.

PARTIES

2. Plaintiff is a sovereign Indian tribe and is recognized as such by the United States. Plaintiff possesses all the legal rights and responsibilities afforded to federally recognized Indian tribes and is eligible for the special programs and services provided by United States to federally recognized Indian tribes.

3. The United States is charged by law with carrying out trust duties and responsibility in connection with the management and administration of the Tribe's trust assets, including both monetary and non-monetary trust assets.

## JURISDICTION

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1505 (the Indian Tucker Act) and 1491 (the Tucker Act) in that the action involves a claim against the United States for money damages brought by an Indian tribe residing within the territorial limits of the United States, and arises under the Constitution, laws, treaties, or regulations of the United States or Executive Orders of the President, including, but not limited to:

a. Treaty with Tribes of Middle Oregon, June 25, 1855. 12 Stat. 963.

b. The Act of December 22, 1987, Pub. L. No. 100-202 and the Act of September 27, 1988, Pub. L. No. 100-446, which require the Bureau of Indian Affairs (the "BIA") to audit and reconcile tribal trust funds, and to provide tribes with an accounting of such funds.

c. The Act of October 23, 1989, Pub. L. No. 101-121, the Act of November 5, 1990, Pub. L. No. 101-512, and the Act of November 13, 1991, Pub. L. No. 102-154, all of which require the BIA to audit, reconcile, and certify through an independent party the results of the reconciliation of tribal trust funds as the most complete reconciliation of such funds possible, and to provide tribes with an accounting of such funds.

d. The Act of October 25,1994, (The American Indian Trust Fund Management Reform Act of 1994), Pub. L. No. 103-412, codified at 25 U.S.C. §§ 161a, 162a, and 4001-4061 (1997), pertinent sections of which require:

(1) Section 101: charges the Secretary of Interior ("Secretary") with a duty to provide periodic, timely reconciliations of tribal trust funds to assure the

accuracy of accounts, and charges the Secretary with a duty to determine accurate cash balances of tribal trust funds.

(2) Section 102(c): requires the Secretary to cause an annual audit of all tribal trust funds to be conducted.

(3) Sections 301 and 302: a Special Trustee for the American Indians is appointed to provide for more effective management of, and accountability for the proper discharge of trust responsibilities to Indian tribes, and to oversee and coordinate reforms within the Department of the Interior of practices relating to the management and discharge of such responsibilities.

(4) Section 303(b)(2)(A): charges the Special Trustee with a duty to monitor the reconciliation of trust accounts to ensure that the BIA provides account holders with a fair and accurate accounting of all trust funds.

(5) Section 303(d): charges the Special Trustee with a duty to provide such guidance as necessary to assist Department personnel in identifying problems and options for resolving problems.

(6) Section 304(2)(A) and (B): charges the Secretary with a duty to report to Congress, identifying for each tribal trust fund a balance reconciled as of September 30,1995. The Secretary's report must include an attestation by each tribe that the Secretary has provided the account holder with as full and complete an accounting as possible and that the tribe accepts the balance as reconciled by the Secretary, or that the tribe disputes the balance as reconciled, and if so, the report must provide an explanation why the tribe disputes the Secretary's balance.

(7) Section 304(3): charges the Secretary with a duty to provide a statement outlining the efforts the Secretary will undertake to resolve the tribe's dispute.

e. Other statutes that describe specifically and generally the United States' duties as a fiduciary in managing Plaintiff's trust funds: 25 U.S.C. §§ 111-148 (Disbursements of Moneys and Supplies); 25 U.S.C. §§ 151-166 (Deposit, Care and Investment of Indian Moneys); and selected statutes of Title 31 of the United States Code;

f. Other Statutes that describe specifically and generally the United States' duties in managing Plaintiff's timber and other non-monetary resources: selected statutes of Title 25 of the United States Code; and 33 U.S.C. §§ 3101-3120 (National Indian Forest Resources Management).

g. Regulations that describe specifically and generally the United States' duties in managing Plaintiff's trust funds: 25 C.F.R. Chap. I, Bureau of Indian Affairs, Department of Interior, Subchapter G--Financial Activities; and selected United States Treasury regulations;

h. Regulations that describe specifically and generally the United States' duties in managing Plaintiff's timber and other non-monetary resources are located in 25 C.F.R. Part 163 and other selected regulations promulgated by various United States agencies;

i. Written policies and manuals published by various United States Departments and Agencies that describe specifically and generally the United States' duties in managing Plaintiff's trust funds, timber and other non-monetary assets; and

5. This court also has jurisdiction over the subject matter of this action under a well-developed body of federal common law describing and defining the fiduciary relationship between the United States and Plaintiff.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

6. The Tribe occupies the Warm Springs Reservation of Oregon (the "Reservation") and is the beneficial owner of approximately 640,000 acres of land within the Reservation, title to which is held in trust by the United States for the benefit of the Tribe. There are additional lands outside of the Reservation that are held in trust by the United States for the benefit of the Tribe.

7. Land held in trust by the United States for the benefit of an Indian tribe is inalienable except as authorized by Congress. Congress has granted the Secretary of Interior authority to approve conveyances of interests in trust land, such as leases, easements, and rights of way. The Secretary of Interior exercises comprehensive regulatory control over the management of lands held in trust for Indian tribes, including those lands held in trust for the Warm Springs Tribe.

8. The lands held in trust for the Tribe include extensive forestland, grazing land and land valuable for hydro-power, geothermal-power and wind-power production. The lands held in trust for the Tribe contain a variety of valuable natural resource assets, including power production resources, timber, plants, water, fish, wildlife, oil, gas, rock, sand, gravel and minerals. The land held in trust for the Tribe and the natural resource assets contained on the land are of enormous economic importance to the Tribe. (The land held in trust for the Tribe and the natural resource assets contained on the trust land are hereinafter referred to as the Tribe's "non-monetary trust assets".)

9. For over one hundred years, the Secretary of the Interior has been charged by Congress with the duty to collect income derived from the Tribe's trust assets and to deposit such income in the United States Treasury and other depository institutions for the benefit of the Tribe. Congress has further directed that interest be paid on the Tribe's funds held in trust and required that such trust funds be invested. Pursuant to the duties and authority delegated by Congress, the Secretary of Interior exercises comprehensive control over the Tribe's trust funds.

(The funds held in trust, including income, funds held on deposit and invested funds, are hereinafter referred to collectively as the Tribe's "trust funds" or "monetary trust assets".)

10. Defendant has during the time period encompassed by this action exercised comprehensive statutory and regulatory control over the management of the Tribe's non-monetary and monetary assets. Defendant has approved leases and other conveyances of interests in trust lands of the Tribe. Defendant has managed the Tribe's forestlands and timber sales and approved compensation agreements for use of the Tribe's hydropower resources. Defendant has controlled, conducted and managed the collection, deposit, investment, and disbursement of the income derived from the Tribe's non-monetary trust assets, including, but not limited to, funds derived from timber sales, hydropower agreements and grazing leases.

11. Under longstanding constitutional, statutory and federal common law, and based upon the historic relationship between the United States and Indian tribes, the United States assumed the obligations and duties of a trustee by establishing and maintaining comprehensive regulatory control of tribal trust lands and resources and the funds derived therefrom. The United States owes a trust duty to the Tribe with regard to the Tribes' trust funds and non-monetary trust assets. In the exercise of that trust duty, the United States is held to the most exacting fiduciary standards.

FIRST CLAIM FOR RELIEF

**(Breach of Trust Duty–Trust Funds Mismanagement)**

12. The United States has violated its trust duty to Plaintiff with regard to its management of the Tribe's trust funds in one or more of the following particulars:

a. By failing to credit the Tribe's trust fund account for the total amount of income derived from the sale or lease of non-monetary trust assets, or otherwise derived from the management of the Tribe's non-monetary trust assets under Defendant's management and control;

b. By failing to credit the Tribe's trust fund account for amounts paid to it or due to it from other sources;

c. By failing to properly record all transactions pertaining to the Tribe's trust fund account;

d. By failing to implement effective cash management practices;

e. By failing to deposit the Tribe's trust funds in interest bearing accounts;

f. By failing to deposit the Tribe's trust funds in interest bearing accounts in a timely manner;

g. By holding the Tribe's trust funds in its treasury at inadequate interest rates;

h. By holding the Tribe's trust funds in various investments paying inadequate interest rates;

i. By utilizing the Tribe's trust funds for purposes not for the exclusive benefit of the Tribe;

j. By otherwise failing to invest and manage the Tribe's trust funds as a prudent trustee to earn the maximum income for the Tribe;

k. By applying the Tribe's trust funds in a manner not authorized by treaty or by express provisions of law;

l. By expending the Tribe's trust funds in an manner that did not exclusively benefit the Tribe;

m. By maintaining and operating a tribal trust fund system that is inadequate to properly and effectively manage tribal trust funds, and utilizing this system to manage the Tribe's trust funds;

n. By failing to maintain adequate systems and controls in the tribal trust fund system to guard against error and dishonesty;

o. By failing to maintain adequate records with regard to tribal trust funds, and failing to properly store tribal trust account documents so that an effective audit and reconciliation can be performed;

p. By failing to perform regular and accurate accountings of tribal trust funds and assets for the trust beneficiary, the Warm Springs Tribe.

13. As a result of Defendant's breaches of its trust duty with regard to the Tribe's trust funds, Plaintiff has been damaged in an amount exceeding $5.5 million, to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**(Breach of Trust Duty–Non-Monetary Trust Asset Mismanagement)**

14. The United States has violated its trust duty to Plaintiff with regard to the Tribe's non-monetary trust assets that include, but are not limited to, the Tribe's forestlands and timber resources in one or more of the following particulars:

a. By failing to derive the maximum income for the sale or lease of the Tribe's non-monetary assets;

b. By failing to collect funds due and owing to the Tribe for the sale or lease of its non-monetary assets, or otherwise derived from the management of its non-monetary assets;

c. By failing to timely collect funds due and owing to the Tribe for the sale or lease of non-monetary trust assets, or otherwise derived from the management of the Tribe's non-monetary assets; and

d. By mismanaging the Tribe's forestlands and timber resources, including, but not limited to, failing to manage the Tribe's forestlands on a sustained-yield basis.

15. As a result of Defendant's breaches of its trust duty with regard to the Tribe's non-monetary trust assets, Plaintiff has been damaged in an amount exceeding $10 million, to be determined at trial.

**WHEREFORE**, Plaintiff Warm Springs Tribe prays for a judgment in its favor and against Defendant as follows:

1. On Plaintiff's FIRST CLAIM FOR RELIEF: For judgment in Plaintiff's favor and against Defendant in an amount to be determined at trial, not less than $5.5 million;

2. On Plaintiff's SECOND CLAIM FOR RELIEF: For judgment in Plaintiff's favor and against Defendant in an amount to be determined at trial, not less than $10 million;

3. To grant Plaintiff prejudgment interest, costs and attorney's fees in this litigation as may be provided by law; and

4. For such other relief as the Court deems equitable and just.

DATED this 25 day of August, 2004.

Michael L. Dillard, Attorney of Record
KARNOPP PETERSEN LLP
1201 N.W. Wall Street, Suite 300
Bend, Oregon 97701-1957
TEL: (541) 382-3011
FAX: (541) 383-3073
mld@karnopp.com
Of Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **SECOND AMENDED COMPLAINT** on:

John H. Martin
Department of Justice
Environment and Natural Resources Division
General Litigation Section
P. O. Box 663
Washington, D.C. 20044-0663
Fax: (202) 305-0506
Attorney For Defendant

by causing a full, true, and correct copy thereof to be sent by the following indicated method or methods, on the date set forth below:

- ☐ by mailing in a sealed, first-class postage-prepaid envelope, addressed to the last-known office address of the attorney, and deposited with the United States Postal Service at Bend, Oregon.
- ☐ by hand delivery.
- ☒ by sending via overnight courier in a sealed envelope.
- ☐ by faxing to the attorney at the fax number that is the last-known fax number for the attorney's office.
- ☐ by electronic service pursuant to LR 100.13.

DATED this 25 day of August, 2004.

KARNOPP PETERSEN LLP

[signature]

Michael L. Dillard, Attorney of Record
KARNOPP PETERSEN LLP
1201 N.W. Wall Street, Suite 300
Bend, Oregon 97701-1957
TEL: (541) 382-3011
FAX: (541) 383-3073
mld@karnopp.com
Of Attorneys for Plaintiff

**CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON v. UNITED STATES,** Case No. 02-126L (CFC) and Case No. 02-CV-02040 (D.D.C.)

## AGREEMENT GOVERNING ADR PROCEEDINGS

I. Scope. This Agreement Governing ADR Proceedings ("ADR Agreement") is entered into by and between the Confederated Tribes of the Warm Springs Reservation of Oregon (the "Tribe") and the United States of America (the "U.S.") (each a "party" and collectively, "the parties").

The parties are currently engaged in the following lawsuits:

1. Confederated Tribes Of The Warm Springs Reservation of Oregon v. United States, Case No. 02-126l (CFC) ("CFC Case")

2. Confederated Tribes Of The Warm Springs Reservation of Oregon v. Norton et al, Case No. 02-02-CV-02040 (D.D.C.) ("D.D.C. Case")

The CFC Case is an action for money damages that has been bifurcated into two phases: Phase I covers the Tribe's trust funds mismanagement claims, and Phase II covers the Tribe's non-monetary asset mismanagement claims. The D.D.C. Case is an action for injunctive relief that seeks a court ordered historical accounting of the Tribe's trust funds and assets.

The parties have embarked upon, and are currently engaged in, alternative dispute resolution ("ADR") proceedings regarding Phase I of the CFC Case and regarding the claim for an historical accounting of the Tribe's trust funds in the D.D.C. Case. The scope of this ADR Agreement is to govern all alternative dispute resolution proceedings for Phase I of the CFC Case and for the funds historical accounting claim in the D.D.C. Case. The scope of this ADR Agreement does not include any other ADR proceedings between the parties that may have occurred, or that may occur in the future, including any such proceedings regarding Phase II of the CFC Case or regarding a claim for an historical accounting of the Tribe's non-monetary trust assets.

II. Purpose. The parties enter into this Agreement to promote the settlement of this case through, among other things, frank, in-depth settlement communications between themselves and with Senior Judge Edward J. Leavy, of the Ninth U.S. Circuit Court of Appeals, who is serving as a mediator between the parties. The ADR process includes: (a) accountants' analysis of specified funds and accounts to quantify potential damage amounts and/or amounts in dispute pursuant to a mutually agreed upon methodology, (b) analysis of investment and interest earnings by the parties' chosen consultants, (c) an exchange of position papers on legal issues relevant to the United States' alleged liability, (d) after completion of (a), (b), and (c), the parties

will participate in a mediation with Judge Leavy to attempt to resolve the CFC Case Phase I claims and the trust funds historical accounting claim .

III. Participants in the ADR Process.

A. Parties. The Parties to the ADR proceedings shall be the Tribe and the U.S.

B. Mediator. The Mediator in the ADR proceedings is Senior Judge Edward J. Leavy of the United States Court of Appeals for the Ninth Circuit. The Mediator has no authority to decide the case or any issues in the case and is not acting as an advocate or attorney for any party.

IV. The ADR Claims.

The ADR process will focus on resolution of the CFC Phase I Claims and the D.D.C. Case Funds Historical Accounting Claim described below (collectively the "ADR Claims"). The Tribe has selected the ADR Claims from its CFC Phase I claims and from the D.D.C. Case The parties aver that this ADR process will sufficiently prepare the parties to permit a negotiated resolution of all the Tribe's Phase I claims in the CFC Case and the trust funds historical accounting claim in the D.D.C. Case. The possibility of engaging in an ADR process regarding the Tribe's Phase II non-monetary trust asset mismanagement claims in the CFC Case will be discussed by the parties upon the conclusion of the ADR process set forth in this ADR Agreement.

A. CFC Phase I Claims.

The overall period addressed for each Phase I claim (to the extent relevant to that claim) is August 13, 1946 to present.

1. Productivity Claims: The productivity claim area contains two grounds: (a) failure to pay statutory interest; and (b) failure to obtain a maximum prudent investment return.

2. Lag Time Claims: The lag time claim area consists of two grounds: (a) Deposit Lag Time (lost interest due to lag time between actual receipt of deposits and the posting of the deposit to the account) and (b) Disbursement Lag Time (lost interest due to the posting of the withdrawal of the funds from the account prior to the negotiation of the check with the U. S. Department of the Treasury).

3. Disbursements Claims: The disbursement claim area contains three grounds: (a) Unappropriated disbursements (without required Congressional appropriation); (b) Improper disbursements; and (c) Unsupported disbursements (unreconciled).

B. D.D.C. Case Funds Historical Accounting Claim.

The only claim in the D.D.C. Case that is included in the ADR Claims is the Tribe's claim for a full historical accounting of it trust funds. All other claims in the D.D.C. Case,

including the claim for an historical accounting of the Tribe's non-monetary assets, are not included in the ADR Claims and are not included in this ADR process.

V. Acknowledgements.

A. The parties make no admission of fact or law, responsibility, fault, or liability by entering into and participating in the ADR process, by entering into this ADR Agreement, by performing any component of the ADR process, or by seeking approval for any proposed settlement developed pursuant to this ADR Agreement.

B. The parties recognize that the parties' counsel and other participants in these ADR proceedings do not possess the necessary authority to settle this lawsuit, and that any settlement proposal developed in these ADR proceedings will not be binding on any party unless and until it has been reduced to writing and signed by appropriate persons who have or have obtained the requisite authority to enter into such an agreement.

VI. ADR Proceedings. The parties have followed, and will follow an ADR process consisting of four components intended, when completed, to provide the basis for settlement of the Tribe's CFC Phase I trust fund mismanagement claims and the Tribe's D.D.C. trust funds historical accounting claim. In the first component, the parties and their retained consultants and experts will analyze specified accounts to quantify potential damage amounts or amounts in dispute pursuant to a mutually agreed upon methodology ("the Accounting Methodology Implementation"). In the second component, the parties will task their respective consultants to analyze the investment and interest income associated with certain specified accounts to review the acceptability of the investment and interest income credited to the Tribe and to quantify potential damage amount or amounts in dispute ("the Investment Analysis"). In the third component, the parties will exchange position papers and meet to discuss their views on various legal issues regarding trust funds management which are relevant to the United States' alleged liability for the Tribe's CFC Case Phase I claims ("the Legal Position Papers"). After completion of the first three components, and based on the results of that work, the parties agree to exchange offers to settle the Tribe's CFC Phase I trust fund mismanagement claims and to participate in a mediation in a good faith effort to settle those claims (the "Settlement Mediation").

A. The Accounting Methodology Implementation.

1. Description of Accounting Methodology. A full description of the accounting methodology to be implemented is contained in the document entitled "*Warm Springs Tribe v. United States* Agreed Upon ADR Methodologies Trust Fund Mismanagement Claims," a copy of which is attached hereto as Exhibit 1. (Exhibit 1 is incorporated herein.)

2. Performance of the Work. The parties agree that the work implementing the accounting methodologies shall be performed as follows in accordance with a schedule mutually agreeable to the parties. It is agreed that work scheduled for completion prior to the execution of this document has already occurred in a timely fashion.

B. Investment Analysis. The parties have each retained their own consultant to evaluate the productivity of the funds at issue. Those consultants have prepared reports which have been shared with the other party. Each consultant has also prepared a preliminary rebuttal report and shared that with the other party. At a mediation session with Judge Leavy on December 15, 2005, the consultants met with the parties, presented the results of their work and discussed the analyses with the parties on a confidential basis.

C. ADR Position Papers. In consultation with the Mediator, the Tribe and U.S. will exchange statements of their position under agreed-upon schedules regarding designated legal issues. In consultation with the Mediator, the Tribe and U.S. shall meet at agreed-upon times, dates, and locations to discuss the strengths and weaknesses of the parties' respective positions regarding designated legal issues. The parties acknowledge that the following list of issues may be modified as the ADR Accounting Methodology, Investment Analysis and the parties' investigations proceed.

At present, these issues include:

1. Claim Preclusion Issue Regarding Pre-1981 productivity claims – Certain productivity claims of the Tribe for periods prior to 1981 have been settled in an earlier Court of Federal Claims lawsuit. The issue is the extent, if any, that this earlier case and its settlement bars any of the CFC Phase I Claims.

2. Disbursement Lag Time Claims Issue – The Tribe's disbursement lag time claim asserts that the Tribe is entitled to earn interest on disbursements made by check until the checks clear the U.S. Treasury. The issue is whether or not the Tribe is legally entitled to some or all of such interest.

3. Special Deposit Accounts (SDAs) – Productivity claims, lag time claims and disbursement claims have been asserted for all special deposit accounts, which the U.S. asserts represent, in material part, advance payments for timber stumpage fees that are transferred to the Tribe as timber is cut. The Tribe claims ownership of any interest earned on such special deposit accounts prior to the point when timber is cut. The U.S. asserts that interest is not allocable to the Tribe until the timber is actually cut and value is determined. The issue is whether or not the Tribe is entitled to this special deposit account interest.

4. IMPL / SDA Interest prior to 1982 – Prior to 1982, the parties understand that it was the policy of the government to post interest on SDAs to an Indian Monies Proceeds of Labor (IMPL) account for government use and not to SDAs. Legislation was enacted and the regulations were changed to include the distribution of remaining IMPL balances and to begin

posting interest to SDA accounts. The issue is whether or not the Tribe is entitled to recover damages for the earlier interest from such SDA accounts that were used by the government and were not in the 1982 IMPL balances turned over to the Tribe.

5. IIM interest. The issue is whether U.S. was legally required, prior to 1994, to invest or award interest on the Tribe's IIM accounts.

VII. Modification of the ADR Agreement. If the parties determine that modification to the ADR process contained in this ADR Agreement is necessary, the parties may, by mutual agreement, amend this ADR Agreement, but such amendment must be in writing signed by both parties. Provided, however, that absent such modification by amendment, the parties shall act in good faith to abide by all terms of this ADR Agreement, as written, including implementation of the Accounting Methodology within the scheduled time periods.

VIII. Confidentiality Agreement Provisions.

A. Definition. As used in this Confidentiality Agreement section, the term "settlement communications" means any communications made, exchanged, or provided by the Tribe, U.S., and their agents, employees, experts, consultants, attorneys, or members of the Tribe, and the Mediator in, or for purposes of, these ADR proceedings whether orally, in writing, electronically, telephonically, or otherwise, including, without limitation, all statements, communications, offers, conduct, findings or conclusions, written submittals, reports, exhibits, appraisals, demonstrative aids, documents, and any part thereof, where such information is designated specifically as "confidential" by either stating that such information is confidential (in the context of verbal communications) or by marking such information as "Confidential" (in the context of written communications), provided that neither party may designate the communications of the other party and their agents, etcetera as confidential.

B. General Agreement of Confidentiality.

It is agreed that:

1. All settlement communications are confidential and shall be deemed compromise negotiations under Rule 408 of the Federal Rules of Evidence. In addition, no party shall disclose any settlement communications, except as herein provided, as compelled by court order, or as otherwise required by law.

2. Settlement communications shall not be used for any purpose outside of these ADR proceedings, including any pending or future proceeding in the Court of Federal Claims or any other court or forum. The parties agree that they shall have no right to use any settlement communications obtained or generated by the Mediator or any other party.

3. The parties shall not, in any subsequent proceedings other than these ADR proceedings – including proceedings in the CFC Case and the D.D.C. Case – subpoena, or seek in any way, the testimony of, or settlement communications provided to, the Mediator.

4. The parties agree that no actions taken, or statements made in the course of these ADR proceedings will be asserted to be the basis for any claim of waiver of the attorney client, work product or deliberative process privileges, or the waiver of the confidentiality of business information.

C. <u>Exceptions to the General Agreement of Confidentiality</u>.

It is agreed that:

1. Information or evidence that is otherwise discoverable or admissible shall not be rendered immune from discovery or inadmissible as a result of its use in settlement communications.

2. The parties may enter into written agreements resolving some or all of the claims or enter factual or procedural stipulations based on agreements made in connection with these ADR proceedings.

3. The parties recognize that the United States is subject to the Freedom of Information Act, 5 U.S.C. § 552, and its associated regulations and may receive a request for information or documents thereto. Except to the extent otherwise permitted by the Freedom of Information Act or other applicable federal law, the parties acknowledge that this Agreement does not prevent the disclosure of any settlement communication which is required to be made public by applicable law.

4. The parties reserve the right to utilize settlement communications as necessary to confidentially inform their respective decision makers with respect to any proposed settlement that results from these ADR proceedings.

5. Within 30 days after conclusion of these ADR proceedings, regardless of whether it results in final disposition of Phase I of the CFC Case or of the D.D.C. Case, the parties shall destroy or return to the originating party all written settlement communications disclosed by the originating party that have been marked as a "SETTLEMENT COMMUNICATION (SUBJECT TO CONTROL UNDER PARA.VIII.C.5)" unless the parties agree otherwise in writing.

6. Each party has used consultants and employees to assist in this ADR (the "ADR consultants"). In the event that the either the CFC Case or the D.D.C. Case, or any part thereof, proceed to further litigation and a party offers any of the ADR consultants as a witness, either as a fact or expert witness, the opposing party agrees that the documents created and materials relied upon by such witness in the course of their engagement in this case shall be

discoverable and admissible as permitted under the ordinary rules of discovery and admissibility, notwithstanding that such materials may have been created or offered for use in this ADR, excepting however that each party agrees to not seek in any way the testimony of, or settlement communications by or to the testifying ADR consultant: (a) arising from work conducted by the consultant after December 15, 2005 through the completion of these ADR proceedings, and (b) any oral settlement communication made at or during any meeting including both parties or phone call between the two parties, including meetings and phone calls attended solely by the parties' respective ADR consultants.

D. Survival of Confidentiality Provisions. The confidentiality provisions of this ADR Agreement shall remain in full force and effect without regard to whether any legal actions or issues arising out of the case are settled or concluded by final judgment or otherwise, and shall survive termination of these ADR proceedings.

E. Confidentiality Acknowledgements. Before participating in these ADR proceedings in this case, each party's respective participating agents, officers, employees, representatives, experts, and consultants shall personally review this Agreement and execute and date an acknowledgment as follows:

> I acknowledge that I have read the Agreement Governing ADR Proceedings that was entered into by the Tribe and the U.S. I understand and agree to comply with the Confidentiality Provisions contained therein.

For purposes of this paragraph, "participating in these ADR proceedings in this case" means preparing, reviewing, evaluating, or analyzing settlement proposals or positions or records provided by the other party in these ADR proceedings. The parties' respective attorneys of record shall retain all such acknowledgments and shall provide copies thereof to opposing counsel upon request.

F. Motion for Court Order: The parties have filed a joint motion in the CFC Case requesting that the Court enter a Protective Order of Confidentiality Re: ADR Proceedings containing provisions substantively the same as those in this section VIII. Regardless of whether or not the Court enters the Protective Order of Confidentiality Re: ADR Proceedings as requested, the parties hereby agree to be bound by the terms of the Confidentiality Agreement Provision in this Agreement.

IX. Effective Date. This Agreement shall become effective upon being signed by the parties. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

X. Execution.

IN WITNESS WHEREOF, the parties have executed this Agreement in separate original counterparts, which shall be deemed a single agreement as of the date of the last signature.

CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON

By: ____________________________ Date: ____________________________

UNITED STATES OF AMERICA

By: ____________________________ Date: ____________________________

# *WARM SPRINGS TRIBE V. UNITED STATES*

## AGREED-UPON ADR METHODOLOGIES

## TRUST FUND MISMANAGEMENT CLAIMS

**OVERVIEW** .......... 3
**THE THREE CLAIMS AREAS** .......... 4
**METHODOLOGIES** .......... 5
**PRODUCTIVITY CLAIMS** .......... 5
I. POL/Award Trust Funds .......... 5
August 13, 1946 to September 1964 .......... 5
October 1964 to March 1981 .......... 6
April 1981 to September 1992 .......... 7
October 1992 to May 2005 .......... 8
II. Tribal IIM and Special Deposit Accounts .......... 9
August 13, 1946 to May 2005 .......... 9
III. IMPL .......... 10
August 13, 1946 to September 1964 and April 1981 until paid out .......... 10
**LAG TIME CLAIMS** .......... 11
**DEPOSIT LAG TIME** .......... 11
I. POL/Award Trust Funds .......... 11
August 13, 1946 to June 1972 .......... 11
July 1972 to September 1992 .......... 12
October 1992 to May 2005 .......... 13
II. Tribal IIM and Special Deposit Accounts .......... 14
August 13, 1946 to May 2005 .......... 14

**DISBURSEMENT LAG TIME** ........ **15**
I. POL/Award Trust Funds ........ 15
August 13, 1946 to May 2005 ........ 15

II. Tribal IIM and Special Deposit Accounts ........ 16
August 13, 1946 to May 2005 ........ 16

**DISBURSEMENT CLAIMS** ........ **17**
I. POL/Award Trust Funds ........ 17
August 13, 1946 to June 1972 ........ 17

July 1972 to September 1992 ........ 18

October 1992 to May 2005 ........ 19

II. Tribal IIM and Special Deposit Accounts ........ 20
August 13, 1946 to May 2005 ........ 20

III. IMPL ........ 21
August 13, 1946 until paid out ........ 21

## OVERVIEW

This document represents the agreed-upon methodologies for quantifying amounts in dispute for the three claim areas identified below. Within each claim area, and for various time periods, methodologies are presented for each of the three account types (to the extent relevant to that claim):

**POL/Awards (Tribal Trust Fund Accounts and Award Accounts)**

**IIM (Individual Indian Monies) Tribal and Special Deposit Accounts**

**IMPL (Indian Monies Proceeds of Labor Accounts)**

The overall period addressed for each claim (to the extent relevant to that claim) is August 13, 1946 to May 2005. To the extent that methodologies are different for different portions of the overall period the discussion under each of the three account types is divided into separate periods.

Within each period, for each claim and account type, there is an identification of the documents to be used, when available, and a description of the methodology for that period. This proposal does not address the legal basis for the claims. Its focus is solely on proposed methodologies for quantifying the amounts in dispute for each claim, within each period, for each type of account. The methodology will be performed for the transactions summarized in Attachment II.

### ACCOUNTS

A list of accounts subject to these procedures is included in Attachment I. The listed accounts fall into one of the following categories:

- **Tribal Trust Accounts** – These are Tribal accounts that have been maintained and accounted for within the Tribal Trust Fund in the accounting system. They include Judgment funds with restricted use and Proceeds of Labor (POL) accounts with no restriction.

- **Tribal IIM Accounts** – These are Tribal funds maintained as part of the Individual Indian Monies (IIM) Trust Fund in the accounting system. Assets were managed as part of the IIM investment pool.

- **Special Deposit Accounts (SDAs)** -- SDAs are holding accounts, also maintained in the IIM Fund, established for a number of reasons to collect and hold deposits pending distribution to account holders or return to the payee, depending on the purpose of the account. As they apply to the Tribe these accounts are primarily used for advanced payments on timber contracts and/or proceeds from sales of rights of way.

- **IMPL Accounts** –These accounts have been maintained in the Tribal and IIM pooled trust funds and represent government established accounts to collect miscellaneous revenue.

## THE THREE CLAIMS AREAS

**1. Productivity Claims**: The productivity claim area consists of two claims: (1) Failure to pay Statutory Interest (4%); and (2) Failure to obtain maximum investment return.

**2. Disbursements Claims**: The disbursement claim area consists of three claims: (1) Unappropriated disbursements (without required Congressional appropriation); (2) Improper disbursements; and (3) Unsupported disbursements (unreconciled).

**3. Lag Time Claims**: The lag time claim area consists of two claims: (1) Deposit Lag Time (lost interest due to lag time between actual receipt of deposits and the posting of the deposit to the account) and (2) Disbursement Lag Time (lost interest due to the posting of the withdrawal of the funds from the account before the check clears the U.S. Treasury Department account on which it is drawn.)

# METHODOLOGIES

## PRODUCTIVITY CLAIMS

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to September 1964**

**A. Documents Needed**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency) or the Treasury Cash Cards, sufficient to show actual Investment Earnings, provided in electronic format ("Electronic Transaction Report").

2. Documents identifying Statutory Interest requirements and calculations for POL/Award Trust Funds during this time period.

3. Documents identifying authorized investments during the period.

4. Published historical records of rates of return for authorized investments identified in point A3.

**B. Methodology to Determine Amounts in Dispute**

1. Use Electronic Transaction Report to compile the actual investment earnings recorded for each POL account during the period August 13, 1946 to September 1964.

2. Each party provides one or more "benchmark" yield rate(s) that might have been achieved for authorized investments based on historical rates of return identified in point A4.

   NOTE: Benchmark yields will be established by financial experts considering market conditions, liquidity needs, investment policies, etc. The established benchmarks will be applied to all funds available for investment (i.e., account fund balance).

3. Use Electronic Transaction Report to compute the Investment Earnings that might have been achieved based on the benchmark yield rate (s) established in point B2.

   a. Disregard the original recorded investment earnings for each period.

   b. Compute the average annual outstanding balance for each year.

   c. Compute investment earnings that might have been earned on the average annual outstanding balance calculated in B3b using the benchmark yield rate(s) determined in B2.

d. Add the Investment Earnings computed in B3c to the outstanding balance and carry forward the adjusted balance as the beginning balance for the next year, thus compounding the effect of the newly calculated hypothetical earnings for subsequent years.

e. Repeat steps B3b through B3d for each of the remaining years.

f. Compile the Investment Earnings that might have been achieved for the period August 13, 1946 to September 1964.

4. Compute the differences between the actual investment earnings recorded, as compiled in point B1, and the calculated Investment Earnings that might have been achieved as compiled in point B3f.

5. Compute the additional Investment Earnings that should have been earned on amount determined in B4 from October 1964 through present.

6. Total results calculated in points B4 and B5.

**Time Period: October 1964 to March 1981**

**A. Documents Needed.**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency) or the Treasury Cash Cards, sufficient to show actual Statutory Interest received on POL/Award Trust Funds during this period, provided in electronic format ("Electronic Transaction Report").

2. Documents identifying Statutory Interest requirement and calculations for POL/Award Trust Funds during this time period.

**B. Methodology to Determine Amounts in Dispute**

1. Use Electronic Transaction Report to compile the Statutory Interest recorded for each POL account during the period October 1964 to March 1981.

2. Use Electronic Transaction Report to compute the Statutory Interest that should have been achieved based on the Statutory Interest documented in A2 above.

NOTE: Procedure/calculation is the same as August 1946 to September 1964 using statutory rates as opposed to benchmark rates.

a. Disregard the original recorded Statutory Interest for each period.

b. Compute the average annual outstanding balance for each year.

c. Compute Statutory Interest that should have been earned on the average annual outstanding balance calculated in B2b using the Statutory Interest documented in A2.

d. Add the Statutory Interest computed in B2c to the outstanding balance and carry forward the adjusted balance as the beginning balance for the next year, thus compounding the effect of the newly calculated earnings for subsequent years.

e. Repeat steps B2b through B2d for each of the remaining years.

f. Compile the Statutory Interest that should have been earned for the period October 1964 to March 1981.

3. Compute the difference between the actual Statutory Interest recorded, as compiled in point B1, and the Statutory Interest that should have been earned computed in point B2f.

4. Compute the additional Statutory Interest that should have been earned on amount determined in B3 from April 1981 through present.

5. Total results calculated in points B3 and B4.

**Time Period: April 1981 to September 1992**

**A. Documents Needed.**

1. Summary and Detail of Trust Funds Reports, equivalent electronic information or other transaction records if these documents do not provide adequate information about date posted and transaction description. ("Electronic Transaction Report").

2. MoneyMax Investment Reports sufficient to provide information about investment processes.

3. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs' independent accountants or by accounting staff at the Agency or the Tribe.

4. Arthur Andersen LLP Agreed-Upon Procedures engagement ("AA Reconciliation Project") investment testing working papers and supporting documents, including electronic Microsoft Access database found at WMS007637.

5. Obtain the documents used to create the investment yield for all tribes as described in AA Reconciliation Project report, see WS-027883.

6. Documents identifying authorized investments for each period (if different from prior period).

7. Published historical records of annual yields for authorized investments.

8. Historical records for the rate on one day market-based certificates (ie the "overnighter" rate) from 1985 forward.

**B. Methodology to Determine Amounts in Dispute**

1. Use Electronic Transaction Report to compile the actual investment earnings and average investment balances. Use Electronic Transaction Report to also (or test AA workpapers) segregate Unallotted ("Uninvested") funds from invested funds.

2. Compare results of average balances as computed in AA Reconciliation Project report to actual as compiled in B1 above. Investigate significant variances . [To be determined]. Note that answer to B2 may affect the reconciliation.

3. Each party shall establish a benchmark investment yield rate(s) based on published rates for the authorized investments identified in point A8.

4. Use Electronic Transaction Report to compute the investment earnings that might have been achieved based on the benchmark yield rates established in point B3. Follow same calculation methodology as applied for the time period August 13, 1946 to September 1964 description B3a through B3f.

5. Compute the differences between the actual investment earnings recorded, as compiled in point B1, and the calculated investment earnings that might have been achieved as compiled in point B4.

6. Compute the additional investment earnings that should have been earned on amount determined in B5 from October 1992 through present.

7. Total results calculated in points B5 and B6.

**Time Period: October 1992 to May 2005**

**A. Documents Needed.**

1. Summary and Detail of Trust Funds Reports, Sungard OmniTrust Reports, TFAS Reports, equivalent electronic information or other general transaction records if these documents do not provide adequate information about date posted and transaction description ("Electronic Transaction Report").

2. MoneyMax Investment Reports sufficient to provide information about investment processes.

3. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs' independent accountants or by accounting staff at the Agency or the Tribe.

4. Documents identifying authorized investments for the period, if different from prior period.

5. Published historical records of annual yields for authorized investments.

6. Historical records for the rate on one day market-based certificates (ie the "overnighter" rate) from 1985 forward.

**B. Methodology to Determine Amounts in Dispute**

1. Review changes in investment policies and Government procedures during this period. Adjust methodology, as applicable. The following procedures assume no adjustment to the methodology.

2. Each party will establish a benchmark investment yield rate(s) based on published rates of authorized investments in point A5.

3. Use Electronic Transaction Report to compute the investment earnings that might have been earned based on the benchmark yield rate (s) in point B2 (Follow same calculation methodology as applied in POL/Award Trust Funds August 13, 1946 to September 1964 B3a through B3f).

4. Compute the difference between the actual investment earnings recorded, from schedules in B3, and the calculated investment earnings that might have been earned as compiled in point B3.

5. Compute the additional Investment Earnings that might have been earned on amount determined in B4 from October 1992 through present (This computation should be included in calculations in B4 since the computation is through the present).

6. Total results calculated in B4 and B5.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. Form 5-796 Individual Indian Tribal and selected Special Deposit Account ("IIM Accounts") Cards, provided in electronic format ("Electronic Transaction Report").

2. IIM Accounts printout or electronic database from IRMS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe, through 2005). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

3. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs independent accountants or by accounting staff at the Agency or the Tribe.

**B. Methodology to Determine Amounts in Dispute**

1. Use the Electronic Transaction Report to compile actual investment earnings (statutory interest only from October 1964 to March 1981) received, if any, for some periods. Special Deposits Accounts will be reviewed to determine the investment return and/or Statutory Interest accrued and paid to the IMPL accounts.

2. For purposes of ADR project, only select Tribal IIM and Special Deposit accounts will be reviewed, which at present are listed in Attachment I.

3. Review the comparison of IIM balances (as reported in the Annual Reports prepared for Warm Springs by its auditor) to the IIM Tribal and Special Deposits balances identified and summarized in point B1 above. (Note: See Non Investment Disbursements claim methodology. This comparison and investigation of any differences was performed in that test.)

4. Use Electronic Transaction Report to (The same calculation methodology as applied in POL/Award Trust Funds August 13, 1946 to September 1964 as follows:

   a. For August 13, 1946 to September 1964 and April 1981 to May 2005 compute investment earnings that might have been received based on the authorized investment benchmark yield rates applied in the POL/AWARD work.

   b. For the October 1964 to March 1981 time period compute Statutory Interest that might have been received based on statutory rates during the period as determined above in POL/AWARD.

5. Compute the difference between actual investment earnings recorded, as compiled in B1 and investment earnings or Statutory Interest that might have been earned as compiled in B4a and B4b.

6. Total results calculated in B5 and B6.

**IMPL**

**Time Period: August 13, 1946 to September 1964 and April 1981until paid out**

**A. Documents Needed**

1. IMPL General Ledger Cards (maintained by the BIA-Area), SunGuard OmniTrust, SEI TFAS reports or other records that provide transaction detail similar to the manual General Ledger cards, provided in electronic format ("Electronic Transaction Report")..

**B. Methodology to Determine Amounts in Dispute**

1. Use the Electronic Transaction Report to compile actual investment earnings (Statutory Interest only from October 1964 to March 1981) received, if any, for some periods. Special Deposits Accounts will be reviewed to determine the investment return and/or Statutory Interest accrued and paid to the IMPL accounts. (Follow same calculation methodology as applied in POL/Award Trust Funds August 13, 1946 to September 1964 B3a through B3f).

2. Compute the difference between actual investment earnings, compiled in B1, and investment earnings that might have been received as compiled in the POL/AWARD work.

3. Compute the additional investment earnings that might have been received on amount determined in B2 through present.

4. Total results calculated in B2 and B3.

**LAG TIME CLAIMS**

**DEPOSIT LAG TIME**

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to June 1972**

**A. Documents Needed**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency), provided in electronic format ("Electronic Transaction Report").

2. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

3. Semi-annual Treasury interest appropriation warrants.

4. Deposit ticket (SF-219) (Similar to SF-215 Deposit Tickets in later years). This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Perform methodology for all transactions summarized in Attachment II.

2. Locate the corresponding collection document, as described in A2, for each receipt and record the "date received" in the database of transactions, as determined from the document. Priority for the date selected will be as follows:

a. The "receipt date" if clearly indicated

b. The earliest date subsequent to the check date (if indicated). This could be indicated by the stamp date of the processed collections voucher, the date the collection voucher was prepared or the date the collection voucher was signed (NOTE: Check date will also be captured for consideration of excessive days between the check date and collection date selected).

c. If no receipt date or check date can be identified (and amount was not a wire transfer), the date will be considered undetermined and not used for determination of the average. The parties will review the frequency of indeterminate dates in the interim results, and decide if the results can be reliably used for ADR.

3. Subtract the date received (listed according to B2) from the posted date in the Electronic Transaction Report.

4. Determine the number of days of "lag time" between the date received and the date deposit was posted. Calculate an average lag time.

5. Compare the average lag time to acceptable lag times proposed by each party based on existing policy and an agreed-upon reasonable deposit time lag. Determine the average variance lag time.

6. Apply the "average variance lag time" findings to the universe of all collections, excluding account transfers with no interest effect.

7. Calculate the investment earnings impact of the average variance lag time using the rate (or rates) determined during the Productivity test above.

8. Compute the additional investment earnings on amount determined in B7 from the date of loss through present using the rate calculated in the Productivity tests above.

**Time Period: July 1972 to September 1992**

**A. Documents Needed**

1. Coopers & Lybrand Report Reconciliation Report.

2. Coopers & Lybrand Reconciliation Working Papers.

3. AA Reconciliation Project working papers for the Deposit Lag Time Test.

4. The General Ledger Control Card (maintained by the BIA-Area Office or Agency) and Summary and Detail of Trust Funds Reports provided in electronic format, ("Electronic Transaction Report").

5. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

FOR SETTLEMENT PURPOSES ONLY

6. SF-215 Deposit Ticket. This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Determine if there is sufficient basis for the Summary of Deposit Lag Time Results for the Tribe as reported in the AA Reconciliation Project report, WS-027922, if not, revise the results based on examination of the documents collected. Concentrate the majority of the effort on the "0" Days categories.

2. Determine the numbers of "0" Days listed that are due to insufficient documentation to determine the receipt date.

3. Derive an appropriate surrogate date for those documents without adequate date support. For example, use actual transaction results for those transactions where dates are subject to verification.

4. Compare the average lag time to acceptable lag times supplied by the parties. Determine the average variance lag time

5. Apply the "average variance lag time" findings to the universe of all collections, excluding account transfers with no interest effect.

6. Calculate the investment return impact of the average variance lag time using the rate (or rates) determined during the Productivity test above.

7. Compute the additional investment earnings on amount determined in B7 from the date of loss through present using the rate calculated in the Productivity tests above.

**Time Period: October 1992 to May 2005**

**A. Documents Needed**

1. Summary and Detail of Trust Funds Reports from 1992 through March 31, 1995, OmniTrust Reports with account balances (040 Reports) - monthly reports held by the OST or in storage on their behalf at Lenexa or in Albuquerque by OTR, or SEI's TFAS reports (monthly) for the Warm Springs Tribal trust accounts. All information shall be provided electronically. ("Electronic Transaction Report")

2. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

3. SF-215 Deposit Ticket. This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Select a sample of collection transactions from the Electronic Transaction Report (see Attachment II). Perform procedures as listed in the August 13, 1946 to June 1972 time period.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. Tribal IIM Ledger Card. provided in electronic format, and, if available, copies of the Tribal IIM and selected Special Deposit Account ledger cards. All information shall be provided electronically. ("Electronic Transaction Report")

2.

3. IIM Account printout from IRMS-IIM and TFAS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe through February 28, 1999 and thereafter from the TFAS-IIM transaction detail.). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

4. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

5. SF-215 Deposit Ticket. This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Test the method for interest calculation from August 13, 1946 to 1989. Determine if any changes should be made to the methodology described below.

2. Perform procedures as listed in the August 13 1946 to June 1972 time period for POL/Award Trust Funds accounts for the selected transactions.

   NOTE: As described in step B1, in applying the calculation of interest for the period prior to 1989 consider the interest distribution method within the IIM Fund in calculating the interest impact of the lag time (i.e., end of month balance as opposed to average balances would affect the calculated interest effect of the lag time).

**DISBURSEMENT LAG TIME**

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency), Summary and Detail of Trust Funds Reports from April 1972 through March 31, 1995, OmniTrust Reports with account balances (040 Reports) - monthly reports from April 1, 1995 through February 28, 1999 held by the OST or in storage on their behalf at Lenexa or in Albuquerque by OTR, or SEI's TFAS reports from March 1, 1999 to present (monthly) for the Warm Springs Tribal trust accounts. All information will be electronic. ("Electronic Transactions Report")

2. SF-1166 document with the confirmation date stamped (or handwritten) when the check(s) were issued, if confirmed copy is available (should be found in the BIA or OST records) and the related SF-1034 and/or Tribal Resolution for all payments selected for testing.

3. Treasury record of date each check was negotiated (e.g., Treasury's microfilm or digital image of negotiated checks sent to Federal Records Centers and those retrieved from Federal Records Centers for any of the years from August 13, 1946 to April 21, 2000; and also digital images of ALC 0699 checks paid after April 21, 2000), the limited availability of which may result in the parties proposing a change in the methodology.

4. Treasury Appropriation Ledgers (Main accounts), Subsidiary Treasury Ledgers of monies appropriated (i.e., moved to disbursement status) and semi-annual Treasury interest appropriation warrants, the limited availability of which may result in the parties proposing a change in the methodology.

5. Records in the Office of Trust Fund Management (OTFM) Activity Tracking System (OATS) related to payments made by OTFM (related to ALC 0699 for checks related to the Warm Springs Tribal disbursements), the limited availability of which may result in the parties proposing a change in the methodology.

**B. Methodology to Determine Amounts in Dispute**

1. Identify the document identification number, transaction date and dollar amount for selected transactions dating from March 1987 to May 2005, found on the following accounting statements: General Ledger Control Card, the Detail of Trust Funds Report, the OmniTrust Report, or the SEI TFAS Report for each disbursement from August 13, 1946 to May 2005 for the Warm Springs Tribe.

2. Locate the corresponding SF-1166 for each disbursement selected in B1 and document any variance noted between the "confirmed disbursement date" from the box (found in the top right part of the document) and the posted date. Capture any such variances in the database.

3. Using Treasury Department documents, establish the date the check actually was cashed or wired from the Tribe's or other Treasury account.

4. Calculate the number of days of "lag time" between the 3 dates (i.e.- 1) the date the disbursement transaction was recorded by the BIA/OST; 2) the date the check or wire transfer actually occurred; and, 3) the date the check was actually cashed and the funds withdrawn from the U.S. Treasury. Calculate an average "lag times" between the three dates.

5. Apply the "lag time" findings to the identified universe of disbursements.

6. Calculate the investment earnings impact of the lag time lost using the days determined in B5 and the rate calculated in the Productivity tests above. Prepare separate calculations for the two different lag times determined in points B4 and B5.

7. Compute the additional investment earnings on amount determined in B6 through present using the rate calculated in the Productivity tests above.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed - related to disbursements authorized and processed for payment by the Indian Service Special Disbursing Agent (ISSDA)**

1. Tribal IIM Ledger Card, provided electronically. ("Electronic Transaction Report")

2. IIM Account printout from IRMS-IIM and TFAS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe through February 28, 1999 and thereafter from the TFAS-IIM transaction detail.). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

3. Treasury record of date checks cleared Treasury (Available from March 1987) the limited availability of which may result in the parties proposing a change in the methodology.

4. Final check registers for the Treasury checks issued by the ISSDA, or check carbons, or daily disbursement reports.

**B. Methodology to Determine Amounts in Dispute**

1. Test the method for interest calculation or investment yield, as applicable, from August 13, 1946 to 1989. Determine if any changes should be made to the methodology described below.

2. Perform methodology as described for POL accounts for the period March 1987 thru May 2005,

**DISBURSEMENT CLAIMS**

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to June 1972**

**A. Documents Needed**

1. General Ledger Control Card (maintained by the BIA – Area Office or Agency) or the US Treasury Cash Ledger Card and Allotment Ledgers, if available, provided electronically. ("Electronic Transaction Report")

2. Annual Appropriation Statutes.

3. US Treasury Annual Report of Receipts, Expenditures and Fund Balances.

4. Tribal bank records, financial reports and associated working papers Tribal Council resolutions, and other tribal records relevant to disbursements.

5. SF-1166 document with the confirmation date stamped (or handwritten) when the check(s) were issued, if confirmed copy is available (should be found in the BIA or OST records) and the related SF-1034 and/or Tribal Resolution for all payments selected for testing.

**B. Methodology to Determine Amounts in Dispute**

1. Use the Electronic Transaction Report to identify disbursements by appropriation and activity code for all disbursements summarized in Attachment II.

2. Using the Annual Appropriation Statutes, identify the amount of and the purpose for appropriated funds.

3. Compare the schedule developed in B2 above to the amounts disbursed as described in B1 above.

4. Identify disbursements that for purposes of ADR will or will not be reviewed. The identification process will be a collaborative effort between the parties. Examples of disbursements that will be reviewed include:

FOR SETTLEMENT PURPOSES ONLY

a. Appropriations including, but not limited to, Health, Agency & Administrative Costs, Law & Order and Education.

b. Per Capita distributions may be reviewed for reasonableness but will not be challenged for disbursement vouching. In addition payments made to the Tribe will be considered for the universe of transactions not challenged.

5. Examine selected high dollar disbursement vouchers for consistency with the purposes enumerated in the Appropriation Act.

6. Examine selected transactions and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

7. Compile a list of challenged and or unsupported disbursements based on the work performed in B4, B5 and B6.

8. Compute the investment earnings on the amount determined at B7 through present using the rate calculated in the Productivity tests above.

9. Total results in B7 and B8.

**Time Period: July 1972 to September 1992**

**A. Documents Needed**

1. General Ledger Control Card (maintained by the BIA – Area Office or Agency) or the US Treasury Cash Ledger Card and the Allotment Ledger, if available, provided electronically. ("Electronic Transaction Report")

2. Summary and Detail of Trust Funds Reports.

3. AA Reconciliation Project non-investment disbursement testing working papers and supporting documents, including electronic Microsoft Access database found at WMS007637.

4. DOI working papers and supporting documents for non-investment disbursement reconciliation procedures (continuation of work not completed in the AA Reconciliation Project).

5. Tribal bank records, financial reports and associated working papers Tribal Council resolutions, and other tribal records relevant to disbursements, as needed.

**B. Methodology to Determine Amounts in Dispute**

1. Examine Arthur Andersen supporting documents for the Warm Springs disbursement test

2. Review working paper support for the transactions reported on in the AA Reconciliation Project Report to conclude on the appropriateness of AA Reconciliation Project assigned Disbursement Codes.

3. Conclude on appropriateness of Disbursement Codes for reconciliation purposes (Using the work previously performed by AA review disbursements for any that will be challenged as to purpose as described in POL/AWARD 1946 to 1971 above).

4. Examine selected transactions and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

5. Compute the Investment Earnings on amount determined in B4 from the date of the transaction through present for those transactions with mutually selected disbursement codes.

6. Total results from B4 and B5.

**Time Period: October 1992 to May 2005**

**A. Documents Needed**

1. Summary and Detail of Trust Funds Reports (through March 31, 1995), OmniTrust Report from 1995 to 1999, or SEI TFAS reports (monthly) for Warm Springs Tribal Trust Accounts (From 1999). All information provided electronically. ("Electronic Transaction Report")

2. Relevant disbursement documentation.

**B. Methodology to Determine Amounts in Dispute**

1. Identify disbursements that for purposes of ADR will or will not be reviewed. The identification process will be a collaborative effort between the parties. Examples of disbursements that will be reviewed include:

   a. Appropriations including, but not limited to, Health, Agency & Administrative Costs, Law & Order and Education.

   b. Per Capita distributions may be reviewed for reasonableness but will not be challenged for disbursement vouching. In addition payments made to the Tribe will be considered for the universe of transactions not challenged.

2. Examine selected transactions (challenged and high dollar amounts) and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

3. Compile a list of challenged and or unsupported disbursements based on the work performed in B1 and B2.

4. Compute the Investment Earnings on the amount determined at B3 through present using the rate calculated in the Productivity tests above.

5. Total results in B3 and B4.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. Form 5-796 Individual Indian Tribal and selected Special Deposit Account ("IIM Accounts") Cards, provided in electronic format. ("Electronic Transaction Report")

2. IIM Account printout from IRMS-IIM and TFAS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe through February 28, 1999 and thereafter from the TFAS-IIM transaction detail). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record)

3. IIM Disbursement Request forms and payment documentation for each selected payment or group of checks. Annual Operating Statement as produced by Area or Central Office (if found may reduce the need for this selected disbursement information).

4. Final check registers for the Treasury checks issued by the ISSDA.

5. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs independent accountants or by accounting staff at the Agency or the Tribe.

6. Tribal bank records , financial reports and associated working papers Tribal Council resolutions, and other tribal records relevant to disbursements, as needed.

**B. Methodology to Determine Amounts in Dispute**

1. For purposes of mediation, only material IIM Tribal accounts and their successors will be reviewed. For example, C-68 is expected to be one of the key accounts reviewed for this case.

2. Identify selected Special Deposit Accounts to be tested for purposes of mediation (see Attachment I).

3. Identify disbursements that for purposes of mediation will or will not be reviewed. The identification process will be a collaborative effort between the parties. Examples of disbursements that will be reviewed include:

   a. Appropriations including, but not limited to, Health, Agency & Administrative Costs, Law & Order and Education.

b. Per Capita distributions may be reviewed for reasonableness but will not be challenged for disbursement vouching. In addition payments made to the Tribe will be considered for the universe of transactions not challenged.

4. Compare the IIM balances as reported in the Annual Reports prepared for Warm Springs by its auditor to the IIM Tribal and Special Deposits balances identified and summarized in B1 above. Investigate any differences over $100,000.

5. Examine selected transactions (challenged and high dollar amounts) and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

6. Compile a list of challenged and or unsupported disbursements based on the work performed in B3, B4 and B5.

7. Compute the Investment Earnings on the amount determined at B6 from the date of loss through present using the rate calculated in the Productivity tests above.

8. Total results in B6 and B7.

**IMPL**

**Time Period: August 13, 1946 until paid out**

**A. Documents Needed**

1. IMPL General Ledger Cards (maintained by the BIA-Area or Agency), provided in electronic format. ("Electronic Transaction Report")

2. Electronic records such as Summary and Detail of Trust Funds or, if not available, copies of General Ledger Detail Ledger reports or other records that provide transaction detail similar to the manual General Ledger cards. (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

3. IMPL Disbursement Request forms and payment documentation for each selected payment or group of checks. Annual Operating Statement as produced by Area or Central Office (if found may reduce the need for this selected disbursement information).

**B. Methodology to Determine Amounts in Dispute**

1. Prepare an electronic summary of the IMPL General Ledger Control Cards. Merge electronic records when available with the electronic summary prepared for the prior years.

2. Create a summary of the categories of payments from IMPL.

3. Identify disbursements that for purposes of mediation will not be challenged. For example payments made to the Tribe will be considered for the universe of transactions not challenged.

4. Examine selected high dollar disbursement vouchers to determine if the amount was paid for goods or services for the tribe with an objective of assigning a disbursement code.

5. Calculate amount in dispute for categories of disbursements identified for payment of goods or services other than for tribal interests.

6. Compute the investment earnings on amount determined in B5 through present.

7. Total results in B5 and B6.

Attachment I

**Warm Springs v. United States**
**ADR Methodologies**
**Account Listings**

| Account Title | Manual Ledger: Tribal Account Number: | Manual Ledger: Alternate Account Number: | Finance System/IRMS | OMNI/TFAS |
|---|---|---|---|---|
| **IMPL** | | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.660 | 8500 | | |
| IMPL WARM SPRINGS AGENCY Interest | | | | |
| REPAIR AND MAINTENANCE BUILDING AND UTILITIES | 14X7200.660.729 | | | |
| IMPL WARM SPRINGS AGENCY GARAGE | 14X7200.600.751 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661.186 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661.393 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661.861 | | | |
| IMPL WARM SPRINGS AGENCY TELEPHONE | 14X7200.707 | | | |
| IMPL WARM SPRINGS AGENCY HOSPITAL | 14X7200.737 | | | |
| IMPL WARM SPRINGS AGENCY TELEPHONE | 14X7200.752 | | | |
| **Tribal Trust** | | | | |
| | | | 7290 | |
| | | | 7790 | |
| PROCEEDS OF LABOR | 14X7472 | | 7472 | PL7472704 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION - REVENUE RESERVE FUND | | | | PL7546708 |
| PROCEEDS OF LABOR (FIRE SUPPRESSION) | 14X7472.392 | | | |
| INTEREST AND ACCRUALS OF INTEREST PROCEEDS OF LABOR | 14X7972 | | 7972 | |
| WARM SPRINGS TRIBE - 9351-69-1 | | | 93512600 | JA9351691 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 98512600 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 93512629 | |
| WARM SPRINGS TRIBE - 9351-29-5 | | | 98512629 | JA9351295 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 94172600 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 99172600 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 94172601 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 99172601 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 94172621 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 98512612 | |
| WARM SPRINGS TRIBE - 9351-10-5 | | | 98512610 | JA9351105 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 99172621 | JA9417211 |
| WARM SPRINGS TRIBES - MATTERS MCQUINN | | | | JA1070696 |
| **Tribal IIM** | | | | |

**Warm Springs v. United States** **Attachment I**

**ADR Methodologies**

**Account Listings**

| | | | | |
|---|---|---|---|---|
| CONFEDERATED TRIBES OF WARM SPRINGS | 145T006800 (Starts 5/19/81) | C 68 | | |
| CONFEDERATED TRIBES OF WARM SPRINGS | 145T006900 (Starts 10/9/84) | C 69 | | |
| CONFEDERATED TRIBES OF WARM SPRINGS [GRANT MONIES] | 145T007000 (Starts 10/26/76) | | | |
| WARM SPRINGS FOREST PRODUCTS INDUSTRIES | 145T007200 (Starts 11/17/83) | W 720 | | |
| **Special Deposit Accounts** | | | | |
| TRIBAL FORESTRY HOLDING ACCOUNT FEES | SD-75 | | | 145S007500 |
| DEPOSITS - OTHER ALLOTTEES - FORESTRY HOLDING ACCT 14X8563 A/R CONTRIBUTIONS | SD-87 | | | |
| PINTO SALVAGE LOGGING UNIT (MCQUINN STRIP) | SD-100 | | | |
| WARM SPRINGS LUMBER CO. SCHOOLIE UNIT LOGGING CONTRACT | SD-110 | | | |

Attachment II

**Warm Springs Tribe v. United States**
**ADR Methodology**

**SCOPES**

**General**

In order to determine reasonable scopes for the ADR methodology, CD&L has analyzed the database of transactions they created from a combination of available electronic data and keyed manual ledgers for years where electronic data are not available. Although for certain accounts, the data is not yet complete, as certain ledgers have not yet been located, the data set is substantially complete for most of the relevant accounts. The data are sufficiently complete to identify data characteristics relevant to project objectives, to set initial scopes and to begin searching for transaction records. CD&L is continuing to complete the data set for incomplete accounts and will identify additional transactions based on established thresholds (scopes), and/or recommend adjusting thresholds as appropriate based on the final data set. The most significant change is expected in the IMPL accounts. Attachment I is a current matrix illustrating the current status of the ledger search and keyed manual ledger data.

Based on CD&L's analysis of the data there is a large concentration of dollar activity in a manageable number of transactions. The focus of the claims is monetary, and the Warm Springs Tribe (Tribe) has expressed an interest in focusing on obtaining dollar coverage in the accounts. The largest impact in valuing these claims will be on high dollar transactions. Attached are summaries of account transactions for each class of account by dollar value illustrating the concentration of account activity (Attachment II).

The recommended scopes result in substantial coverage of all relevant accounts and claims. This approach assumes that transactions not included in the document testing phase will be included in the calculation of amounts in dispute relating to lag times applying the average lag times determined from tested items.

In summary, not considering the transaction documents readily available on the Andersen CD's (i.e. 1972 through 1992) this approach will require the location of source documents for approximately 1,560 additional transactions. The transactions selected have been identified as receipts or disbursements based on data characteristics, however if through document research, these transactions are found to be transfers, they will be eliminated from our testing as these are specifically excluded in the ADR methodology.

Recommended scopes are summarized below.

**Productivity Claim –**

Approach does not involve sampling but is an overall test designed for full coverage of investment earnings

Attachment II

**Receipt Lag Time Claim –**

**Tribal Trust Accounts**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Pre 1972 | Trans. >= $100K | 26 | $ 18,355,141 | 97% |
| 1973 - 1992 | All Andersen and D&T trans. | 1,295 | 276,850,627 | 95% |
| 1993 – 2005 | Trans. >= $100K | 133 | 115,600,113 | 99% |

**Tribal IIM and IMPL**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Earliest date through 2005 | Trans. >= $100K | 417 | $184,002,498 | 93% |

**Special Deposit Accounts**

**Phase I** – Results of Phase I scope will be evaluated to determine potential impact to the Tribe prior to proceeding with phase two

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $100K | 57 | $7,171,529 | 39% |

**Phase II** – To be initiated if deemed necessary after completion of phase I

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $50K < $100K | 78 | $5,228,531 | 28% |

**Total Phase I and II**

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $100K | 135 | $12,400,060 | 67% |

**Disbursement Lag and Disbursement Claim –**

Attachment II

**Tribal Trust Accounts**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Pre 1972 | Trans. >= $100K | 56 | $32,260,467 | 95% |
| 1973 - 1992 | All Andersen and CD&L trans. | 432 | $278,215,886 | 99.9% |
| 1993 – 2005 | Trans. > $100K | 221 | $100,265,096 | 94% |

**Tribal IIM and IMPL**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Earliest date through 2005 | Trans. > =$100K | 453 | $168,087,399 | 79% |

**Special Deposit Accounts**

**Phase I** – Results of Phase I scope will be evaluated to determine potential impact to the Tribe prior to proceeding with phase two

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $100K | 65 | $14,801,566 | 69% |

**Phase II** – To be initiated if deemed necessary after completion of phase I

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $50K < $100K | 53 | 3,847,136 | 18% |

**Total Phase I and II**

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $50K | 118 | $18,648,702 | 87% |

# COOPERATIVE AGREEMENT

**PARTIES: THE CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION OF OREGON** **("Tribe")**

**UNITED STATES DEPARTMENT OF INTERIOR, OFFICE OF HISTORICAL TRUST ACCOUNTING** **("OHTA")**

This Cooperative Agreement ("Agreement") is entered into by and between the Tribe and OHTA (collectively the "Parties"). In consideration of the mutual terms, covenants, and conditions of this Agreement, the Parties agree as follows.

## 1. BACKGROUND

**1.1** In the Spring of 2002, the Tribe filed a lawsuit against the United States in the United States Court of Federal Claims ("CFC Case"). The CFC Case is bifurcated into two phases: Phase I covers the Tribe's trust funds mismanagement claims, and Phase II covers the Tribe's non-monetary trust asset mismanagement claims.

**1.2** In the Fall of 2002, the Tribe filed a lawsuit against the Secretary of the Interior, Interior's Assistant Secretary of Indian Affairs, and the Secretary of the Treasury in the United States District Court, District of Columbia, Case No. 02CV2040-RCL, seeking injunctive relief in the form of a court ordered historical accounting of its trust funds and assets and a court ordered development of a system for the management and accounting of the Tribe's trust funds and assets ("D.C. District Court Case").

**1.3** Since the Fall of 2004, the Tribe and the United States have been engaged in an alternative dispute resolution process ("ADR Process") in an effort to develop and pursue a non-litigation approach to resolve both the D.C. District Court Case and Phase I of the CFC Case. The ADR Process focused on developing accounting methodologies to analyze the Tribe's Phase I claims in the CFC Case ("ADR methodologies"). The United States' funded development and implementation of these ADR methodologies constitute a mutually acceptable full and fair "in lieu" alternative to a full historical accounting of the Tribe's trust funds.

**1.4** The Secretary of the Interior created OHTA in 2001 to oversee the historical accounting of Individual Indian Money (IIM) accounts. Since that time, OHTA's charge has been broadened to include historical accounting for tribal trust accounts, including those of the Tribe.

**1.5** OHTA has been participating in the ADR Process with the Tribe. In order to advance the cooperative development and implementation of the ADR methodologies used in the ADR Process, OHTA has advised the Tribe that it has funds available in its Fiscal Year 2006 budget to fund certain activities of the Tribe in (1) monitoring and evaluating the United States' implementation of the ADR methodologies in the ADR Process and (2) developing schedules of yields of certain authorized investments for the Tribe's trust funds ("Authorized Investments").

**1.6** The ADR methodologies have been fully implemented and have been monitored and evaluated by the Tribe. Those methodologies and the Tribe's monitoring and evaluation of their implementation were a key component to the settlement and dismissal of the D.C. District Court Case and of the Phase I claims in the CFC Case.

## 2. PURPOSE

The purpose of this Agreement is to provide up to $115,000 in Federal Financial Assistance to the Tribe during Fiscal Year 2006 to support the Tribe's activities in monitoring and evaluating the United States' implementation of the ADR methodologies. The Parties recognize that the Tribe's work assisting in monitoring and evaluating the implementation of the ADR methodologies was a necessary and important component of the ADR Process. The Parties have mutually made a concerted good faith effort to use the non-litigation ADR Process to resolve both the D.C. District Court accounting claim and systems claim and Phase I of the CFC Case. The Parties acknowledge and affirm that this Agreement will provide the Tribe with funds in an amount up to, but not exceeding, $115,000 to support the Tribe's Fiscal Year 2006 costs (including indirect costs) for the Tribe to monitor and evaluate the United States' implementation of the ADR methodologies and for the Tribe to develop schedules of Authorized Investment yields. This Agreement does not in any way constitute a settlement of, or a commitment to settle in the future, any of the claims in the D.C. District Court Case for an historic accounting of non-monetary assets or any claims in Phase II of the CFC Case.

## 3. ADMINISTRATIVE

**3.1 Approval.** OHTA will make available up to $115,000 to the Tribe as specifically described in this Agreement.

**3.2 Program and Program Officer:** OHTA, Washington, DC.

**3.3 Recipient:** Tribe, Warm Springs Reservation, OR.

## 4. AUTHORITY AND SCOPE OF WORK

**4.1 Authority.** The authority for this Agreement includes Department of Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54 (August 2, 2005), and Secretarial Order 3231, Amendment No. 3, June 28, 2004.

**4.2 Scope of Work.** The scope of work covered by this Agreement includes the work that the Tribe has performed during Fiscal Year 2006 in monitoring and evaluating the implementation of the ADR methodologies and in developing schedules of Authorized Investment yields. As used in this Agreement, "reasonable and allocable costs" are defined as

those costs that the Tribe has incurred during Fiscal Year 2006 in monitoring and evaluating the implementation of the ADR methodologies and in developing schedules of Authorized Investment yields, including, but not limited to, (1) consultant fees paid to accountants and other experts engaged by the Tribe to monitor, evaluate, and test the implementation of the methodologies, and (2) travel and other costs incurred by such experts in connection with the methodologies development. All funds expended by the Tribe shall be subject to review and audit by OHTA to ensure that said costs are reasonable and allocable or otherwise allowable under this Agreement. Reasonable and allocable costs do not include litigation fees and costs such as fees paid to the Tribe's attorneys, even if such attorneys' fees were incurred in the development and implementation of the accounting methodologies and in the ADR Process.

**4.2.1 Tribal Expertise and Consultants.** Since at least October 1, 2005, the Tribe has employed three expert accounting consultants—Sandra K. Johnigan, Jim Parris, and Paul J. Gillis—and one accounting firm, Bland & Associates PC, to assist it in monitoring and evaluating the United States' implementation of the ADR methodologies in the ADR Process. Ms. Johnigan is the Tribe's lead expert accounting consultant. Ms. Johnigan directed and oversaw the monitoring work. The Tribe engaged Bland & Associates to provide accounting staff support to Ms. Johnigan for the purpose of testing approximately twenty percent (20%) of the transactions that the United States examined as part of the ADR Process. Mr. Parris and Mr. Gillis participated in the implementation of the accounting methodologies according to their respective area of expertise by time era; Mr. Parris focused on the years after 1966 while Mr. Gillis focused on 1966 and prior years. The Tribe also has employed Christopher James, Ph.D., as its investment expert consultant.

**4.2.2 Tribe's Activities and Deliverables.** The Tribe completed the following activities and provided the following deliverables:

**4.2.2.1** In September 2005, the Tribe delivered to the United States and OHTA a report prepared by Ms. Johnigan and Mr. Parris, entitled *Evaluation of the Arthur Andersen Procedures Related to Disbursement Transactions Recorded by the Bureau of Indian Affairs & Supporting Documentation During the Period July 1, 1972 through September 30, 1992*. That report meaningfully advanced the ADR Process and assisted the Parties in implementing and monitoring the ADR methodologies in Fiscal Year 2006.

**4.2.2.2** Ms. Johnigan and Bland & Associates reviewed the October 14, 2005 Chavarria, Dunne & Lamey LLC Interim Report and, after completing such reviews, issued written reports dated November 13, 2005, and November 4, 2005, respectively;

**4.2.2.3** Dr. James' research assistant prepared a schedule of rates of some of the Authorized Investments as part of his evaluation of the ADR Productivity Claim area.

**4.2.2.4** On October 26, 2005, Ms Johnigan and representatives from Bland & Associates met with representatives of Chavarria, Dunne & Lamey LLC ("CD&L") in Albuquerque, New Mexico. The purpose of the trip was to obtain an overview of the CD&L October 14, 2005 Report. In addition, CD&L representatives provided technical support to

Bland & Associates to facilitate the review of the supporting documents produced with the Report.

**4.2.2.5** Ms. Johnigan traveled to Portland and attended the December 14 and 15, 2005 mediation session. During the December 14 meeting, Ms Johnigan (and Bland & Associates by teleconference) met with CD&L representatives to discuss specific issues noted during the review of the CD&L November 28, 2005 Report. The information obtained assisted Bland & Associates in completing its December 22, 2005 Monitoring Report.

**4.2.2.6** Bland & Associates tested approximately twenty percent (20%) of the transactions that are part of the ADR methodologies by reviewing the reports, supporting documents, analysis, and results provided by the United States. Bland & Associates also tested the completeness of the universe of transactions from which the original sample was selected. Ms. Johnigan coordinated the test of the transactions and, along with Bland & Associates, issued periodic written reports of all tests and other reviews, including a final written report that was delivered on January 23, 2006.

**4.2.3 Tribe's Reasonable and Allocable Costs.** Attached as Appendix D to this Agreement is the schedule of the Tribe's costs that it has incurred. The Tribe has submitted invoices showing certain fees, costs, hours billed, cost per hour, and total costs. OHTA will review these invoices and any additional documentation provided and will determine what of these charges are reasonable and allocable and allowable under this Agreement. OHTA will then approve, up to $115,000, those charges that are determined to be reasonable and allocable and allowable under this Agreement. This sum will be processed for payment to the Tribe as soon as possible.

**4.3 Statement of Substantial Involvement.** OHTA has substantial involvement in this project through the joint development of the ADR methodologies, actual performance of accounting tasks, and the provision of information to the Tribe. The Tribe is responsible, among other things, for: (1) performing the activities supported by this Agreement, including the provision of the required personnel, facilities, equipment, supplies, and services, (2) providing Tribal documents to OHTA, (3) proposing and commenting on approaches, (4) attending settlement discussions and participating in the ADR Process, and (5) submitting the deliverables and other required reports and writings to the OHTA Program Manager. OHTA is responsible, among other things, for: (1) cooperating in the implementation of the ADR methodologies, (2) conducting project review meetings to ensure adequate progress and that the Tribe's activities accomplish program and project objectives, (3) attending settlement discussions and participating in the ADR Process, and (4) promoting and facilitating project activities.

## 5. DURATION

This Agreement shall be effective upon the execution of this Agreement by all signatories and shall thereafter include the period encompassed by the authorization of pre-award costs and end on September 30, 2006. The Period governing this Agreement is based upon the Federal Government's Fiscal Year (October 1 through September 30).

## 6. NOTICE

Any notice under this Agreement shall be in writing and delivered in person or by public or private courier service (including the U.S. Postal Service Express Mail) or Certified Mail with return receipt requested, or by facsimile. All notices shall be addressed to the Parties at the following addresses or at such other addresses as the Parties may direct in writing from time to time.

| | | |
|---|---|---|
| For Tribe | Name: | Charles R. Calica, Secretary-Treasurer<br>The Confederated Tribes of the Warm Springs<br>Reservation of Oregon |
| | Address: | P.O. Box C<br>Warm Springs, OR 97761 |
| | Phone: | 541.553.3232 |
| | Fax: | 541.553.2236 |
| | E-mail: | jcalica@wstribes.org |
| | and | |
| | Name: | Michael L. Dillard<br>Karnopp Petersen LLP |
| | Address: | 1201 NW Wall Street, Suite 300<br>Bend, Oregon 97701 |
| | Phone: | 541.389.8409 |
| | Fax: | 541.383.3073 |
| | E-mail: | mld@karnopp.com |
| For OHTA | Name: | John H. McClanahan<br>Tribal Trust Accounting Program Manager<br>Office of Historical Trust Accounting<br>U.S. Department of the Interior |
| | Address: | 1801 Pennsylvania Ave., NW, Suite 500<br>Washington, D.C. 20006 |
| | Phone: | 202.327.5345 |
| | Fax: | 202.327.5375 |
| | E-mail: | John_McClanahan@ios.doi.gov |

For NBC Name: Lincoln S. Capstick III
Agreements Officer
National Business Center
U.S. Department of the Interior
Address: 7301 W. Mansfield Ave.
Denver, CO 80235
Phone: 303 969 5032
Fax: 303 969 5468
E-mail: Lincoln_S_Capstick@nbc.gov

Any notice shall be deemed to have been given on the earlier of (1) actual delivery or refusal to accept delivery, (2) the date of mailing by certified mail, or (3) the day facsimile delivery is verified.

## 7. OTHER PROVISIONS

**7.1 Assignment, Delegation, Subcontracting.** The Tribe may subcontract any part of the work that is required to perform the activities described herein. The Tribe shall be accountable for all costs incurred at any level and shall remain subject to review for reasonableness, allocability, and allowability. OHTA may obtain assistance from other entities, such as Interior's National Business Center, to assist with various non-substantive administrative tasks associated with this Agreement, including review of draw requests and processing of advance payments.

**7.2 Work Product and Reports.** Any work product of or reports generated by the joint implementation of the accounting methodologies, as part of the ADR Process, will be deemed to be the joint property of OHTA and the Tribe, and shall be made available to each party in a timely manner. This provision, however, does not in any way waive or affect (1) the attorney-client privilege or attorney work product doctrine protection that each party has with respect to the involvement of, or work done by, their respective legal counsel, or (2) with respect to OHTA, the deliberative process privilege.

**7.3 Payments:** The Tribe will present requests for payments in accordance with the Tribe's Budget, SF 424A, which is attached hereto as Appendix E, and with the Cost Principles for State, Local, and Indian Tribal Governments, OMB Circular A-87, and 43 CFR Part 12. The Tribe shall expend the Government-appropriated funds paid or advanced to it exclusively to fulfill the purpose of this Agreement. The Tribe will submit an SF 270 and OHTA will then process the SF 270 for payment. OHTA reserves the right to decline payment for any cost that is deemed unreasonable, unallocable, or unallowable.

**7.4 Annual Audit.** The Tribe shall provide OHTA with a copy of the annual independent audit that may be conducted on the Tribe's program administration and function compliance pursuant to OMB Circular A-133 or otherwise.

**7.5 Certified Public Accountants.** In order to ensure appropriate performance of the activities under this Agreement, at least one person retained by the Tribe shall be a Certified Public Accountant (CPA) who maintains a current license in the state where the CPA maintains his or her principal office, and complies with the corresponding and continuing professional education requirements. All monitoring reports and other monitoring deliverables issued under this Agreement on behalf of the Tribe shall be signed by a CPA.

**7.6 Attached Documents.** The following documents are attached hereto and incorporated herein by reference as though fully set forth:

**7.6.1** Appendix A, Application for Federal Assistance SF-424

**7.6.2** Appendix B, Assurances – Non-Construction Programs, SF 424B

**7.6.3** Appendix C, U.S. Department of the Interior, Certifications for Federal Assistance

**7.6.4** Appendix D, Tribe's Schedule of Costs

**7.6.5** Appendix E, Tribal Budget, SF 424A

**7.6.6** Appendix F, SF269 Financial Status Report (Long Form)

**7.7 Requirements.** The Tribe shall comply with the following requirements which are incorporated herein by reference as though fully set forth:

**7.7.1** All costs, to be paid for by the Government, must be reasonable, allocable and allowable as outlined in guidelines published in the Office of Management and Budget Circular Cost Principles for State, Local, and Indian Tribal Governments, OMB Circular A-87;

**7.7.2** Grants and Cooperative Agreements with State and Local Governments, OMB Circular A-102; and

**7.7.3** 43 CFR Part 12, Administrative and Audit Requirements and Cost Principles for Assistance Programs (all subparts that are applicable to State and Local Governments).

**7.8 Travel.** All official travel by the Tribe and its consultants as deemed necessary by the Tribe's Secretary-Treasurer shall be at standard coach fares or less. The Tribe's travel policies must be consistent with current U.S. Government travel regulations, as published in the Federal Register. All travel shall be performed on a reimbursable basis. Receipts and other supporting documentation shall be provided to the Tribe when invoicing for travel and retained by the Tribe. Payment of travel, per diem, and other expenses shall be considered reasonable, allocable, and allowable only to the extent that such costs do not exceed on a daily basis the maximum per diem rates in effect at the time set forth in the Federal Travel Regulations, prescribed in the General Service Administration, available online at http://policyworks.gov/org/main/mt/homepage/mtt/perdiem/travel.htm.

**7.9 Financial Cost/Reporting.** The Tribe will expend the U.S. Government-appropriated funds advanced to it exclusively to fund the scope of work set forth in Section 4.2 of this Agreement. The Tribe will provide to OHTA quarterly reports via SF 269, or as otherwise agreed in writing, within 30 calendar days after the end of each calendar quarter noting each specific cost incurred for specific tasks accomplished during the reporting period. The Tribe will provide OHTA with an annual financial report via SF 269, or as otherwise agreed in writing, within 90 days after the expiration or termination of this Agreement.

**7.10 Modification.** No supplements, modifications, waivers, or terminations of this Agreement shall be binding unless executed in writing by the Parties to be bound thereby.

**7.11 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signed original counterparts shall be delivered to OHTA for retention in the file with copies provided for all Parties.

**7.12 Authority.** The signatories to this Agreement represent and warrant that they have the requisite authority and approval to enter into this Agreement and that this Agreement shall be binding on the Parties.

**7.13 Termination of Agreement.** Either OHTA or the Tribe may terminate this Agreement upon written notification with 30 days' advance notice. In the event this Agreement is terminated, funds allocated for tasks not yet performed shall revert to OHTA. Tasks which have been performed prior to notice of termination shall be paid out of funds advanced under this Agreement. With the exception of activities necessary to terminate this Agreement or to preserve or compile useful information developed hereunder, no activities will occur once the Parties have notice of termination.

**7.14 Disputes.** The Agreements Officer is the final decision maker on any administrative dispute between the Tribe and OHTA under this Cooperative Agreement. However, the parties expressly acknowledge that this Cooperative Agreement contemplates a complex dispute mechanism process involving Tribal trust fund accounts and that the Agreements Officer has no dispute resolution control over any dispute or disagreement regarding the substance of that process (i.e, resolution of trust fund accounting and other issues as they may arise). The parties intend to use every reasonable means available, including the use of a neutral mediator if necessary, to try to avoid terminating this agreement.

**7.15 Reporting Requirements.** The Tribe shall use the SF 269, Financial Status Report (Long Form) (Appendix F) in the applicable quarter and at the end of the year to report the status of funds for all non-construction projects or programs.

## ACCEPTANCE

The foregoing Agreement among the Tribe and OHTA is accepted as evidenced by the signatures below.

**TRIBE:** **THE CONFEDERATED TRIBES OF THE WARM SPRING RESERVATION OF OREGON**

______________________________ ______________
Charles R. Calica, Secretary-Treasurer Date

**OHTA** **OFFICE OF HISTORICAL TRUST ACCOUNTING**

______________________________ ______________
Bert T. Edwards, Executive Director Date

Version 7/03

**APPLICATION FOR FEDERAL ASSISTANCE**

| | | |
|---|---|---|
| **TYPE OF SUBMISSION:** Application: ☐ Construction ☑ Non-Construction; Pre-application: ☐ Construction ☐ Non-Construction | **2. DATE SUBMITTED** ________, 2006 | Applicant Identifier N/A |
| | **3. DATE RECEIVED BY STATE** | State Application Identifier |
| | **4. DATE RECEIVED BY FEDERAL AGENCY** | Federal Identifier |

**5. APPLICANT INFORMATION**

| | |
|---|---|
| Legal Name: Confederated Tribes of the Warm Springs Reservation of Oregon | **Organizational Unit:** Department: Secretary-Treasurer |
| Organizational DUNS: 041266073 | Division: |
| **Address:** Street: PO Box C, 1233 Veterans Street | **Name and telephone number of person to be contacted on matters involving this application (give area code)** Prefix: Mr. First Name: Charles |
| City: Warm Springs | Middle Name R. |
| County: Jefferson | Last Name Calica |
| State: Oregon Zip Code 97761 | Suffix: |
| Country: U.S.A. | Email: jody.calica@wstribes.org |
| **6. EMPLOYER IDENTIFICATION NUMBER** *(EIN)*: 93-0383363 | Phone Number (give area code) 541-553-3232; Fax Number (give area code) 541-553-2236 |
| **8. TYPE OF APPLICATION:** ☑ New ☐ Continuation ☐ Revision. If Revision, enter appropriate letter(s) in box(es) (See back of form for description of letters.) ☐ ☐ Other (specify) | **7. TYPE OF APPLICANT:** (See back of form for Application Types) K. Other (specify) |
| | **9. NAME OF FEDERAL AGENCY:** |
| **10. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER:** ☐☐-☐☐☐ TITLE (Name of Program): | **11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:** |
| **12. AREAS AFFECTED BY PROJECT** *(Cities, Counties, States, etc.)*: Warm Springs Reservation, Jefferson and Wasco Counties, Oregon | |
| **13. PROPOSED PROJECT** Start Date: 10-01-2005; Ending Date: 9-30-2006 | **14. CONGRESSIONAL DISTRICTS OF:** a. Applicant 2nd; b. Project 2nd |

| **15. ESTIMATED FUNDING:** | |
|---|---|
| a. Federal | $ 115,000 .00 |
| b. Applicant | $ .00 |
| c. State | $ .00 |
| d. Local | $ .00 |
| e. Other | $ .00 |
| f. Program Income | $ .00 |
| g. TOTAL | $ 115,000 .00 |

**16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS?**

a. Yes. ☐ THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON DATE:

b. No. ☑ PROGRAM IS NOT COVERED BY E. O. 12372

☐ OR PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW

**17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT?**

☐ Yes If "Yes" attach an explanation. ☐ No

**18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT. THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE IS AWARDED.**

| a. Authorized Representative | | |
|---|---|---|
| Prefix Mr. | First Name Charles | Middle Name R. |
| Last Name Calica | | Suffix |
| b. Title Secretary-Treasurer | | c. Telephone Number (give area code) 541-553-3232 |
| d. Signature of Authorized Representative | | e. Date Signed ________, 2006 |

Previous Edition Usable
Authorized for Local Reproduction

Standard Form 424 (Rev.9-2003)
Prescribed by OMB Circular A-102

Appendix A
Page 1 of 2

**INSTRUCTIONS FOR THE SF-424**

ublic reporting burden for this collection of information is estimated to average 45 minutes per response, including time for reviewing ıstructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0043), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE OFFICE OF MANAGEMENT AND BUDGET. SEND IT TO THE ADDRESS PROVIDED BY THE SPONSORING AGENCY.**

This is a standard form used by applicants as a required face sheet for pre-applications and applications submitted for Federal assistance. It will be used by Federal agencies to obtain applicant certification that States which have established a review and comment procedure in response to Executive Order 12372 and have selected the program to be included in their process, have been given an opportunity to review the applicant's submission.

| Item: | Entry: | Item: | Entry: |
|---|---|---|---|
| 1. | Select Type of Submission. | 11. | Enter a brief descriptive title of the project. If more than one program is involved, you should append an explanation on a separate sheet. If appropriate (e.g., construction or real property projects), attach a map showing project location. For preapplications, use a separate sheet to provide a summary description of this project. |
| 2. | Date application submitted to Federal agency (or State if applicable) and applicant's control number (if applicable). | 12. | List only the largest political entities affected (e.g., State, counties, cities). |
| 3. | State use only (if applicable). | 13 | Enter the proposed start date and end date of the project. |
| 4. | Enter Date Received by Federal Agency<br>Federal identifier number: If this application is a continuation or revision to an existing award, enter the present Federal Identifier number. If for a new project, leave blank. | 14. | List the applicant's Congressional District and any District(s) affected by the program or project |
| 5. | Enter legal name of applicant, name of primary organizational unit (including division, if applicable), which will undertake the assistance activity, enter the organization's DUNS number (received from Dun and Bradstreet), enter the complete address of the applicant (including country), and name, telephone number, e-mail and fax of the person to contact on matters related to this application. | 15 | Amount requested or to be contributed during the first funding/budget period by each contributor. Value of in kind contributions should be included on appropriate lines as applicable. If the action will result in a dollar change to an existing award, indicate only the amount of the change. For decreases, enclose the amounts in parentheses. If both basic and supplemental amounts are included, show breakdown on an attached sheet. For multiple program funding, use totals and show breakdown using same categories as item 15. |
| 6. | Enter Employer Identification Number (EIN) as assigned by the Internal Revenue Service. | 16. | Applicants should contact the State Single Point of Contact (SPOC) for Federal Executive Order 12372 to determine whether the application is subject to the State intergovernmental review process. |
| 7. | Select the appropriate letter in the space provided.<br>A. State<br>B. County<br>C. Municipal<br>D. Township<br>E. Interstate<br>F. Intermunicipal<br>G. Special District<br>H. Independent School District<br>I. State Controlled Institution of Higher Learning<br>J. Private University<br>K. Indian Tribe<br>L. Individual<br>M. Profit Organization<br>N. Other (Specify)<br>O. Not for Profit Organization | 17. | This question applies to the applicant organization, not the person who signs as the authorized representative. Categories of debt include delinquent audit disallowances, loans and taxes. |
| 8. | Select the type from the following list:<br>• "New" means a new assistance award.<br>• "Continuation" means an extension for an additional funding/budget period for a project with a projected completion date.<br>• "Revision" means any change in the Federal Government's financial obligation or contingent liability from an existing obligation. If a revision enter the appropriate letter:<br>A. Increase Award B. Decrease Award<br>C. Increase Duration D. Decrease Duration | 18 | To be signed by the authorized representative of the applicant. A copy of the governing body's authorization for you to sign this application as official representative must be on file in the applicant's office. (Certain Federal agencies may require that this authorization be submitted as part of the application.) |
| 9. | Name of Federal agency from which assistance is being requested with this application. | | |
| 10. | Use the Catalog of Federal Domestic Assistance number and title of the program under which assistance is requested. | | |

SF-424 (Rev. 7-97) Back

Appendix A
Page 2 of 2

OMB Approval No. 0348-0040

## ASSURANCES - NON-CONSTRUCTION PROGRAMS

. ublic reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0040), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE OFFICE OF MANAGEMENT AND BUDGET. SEND IT TO THE ADDRESS PROVIDED BY THE SPONSORING AGENCY.**

**NOTE:** Certain of these assurances may not be applicable to your project or program. If you have questions, please contact the awarding agency. Further, certain Federal awarding agencies may require applicants to certify to additional assurances. If such is the case, you will be notified.

As the duly authorized representative of the applicant, I certify that the applicant:

1. Has the legal authority to apply for Federal assistance and the institutional, managerial and financial capability (including funds sufficient to pay the non-Federal share of project cost) to ensure proper planning, management and completion of the project described in this application.

2. Will give the awarding agency, the Comptroller General of the United States and, if appropriate, the State, through any authorized representative, access to and the right to examine all records, books, papers, or documents related to the award; and will establish a proper accounting system in accordance with generally accepted accounting standards or agency directives.

3. Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain.

4. Will initiate and complete the work within the applicable time frame after receipt of approval of the awarding agency.

5. Will comply with the Intergovernmental Personnel Act of 1970 (42 U.S.C. §§4728-4763) relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration (5 C.F.R. 900, Subpart F).

6. Will comply with all Federal statutes relating to nondiscrimination. These include but are not limited to: (a) Title VI of the Civil Rights Act of 1964 (P.L. 88-352) which prohibits discrimination on the basis of race, color or national origin; (b) Title IX of the Education Amendments of 1972, as amended (20 U.S.C. §§1681-1683, and 1685-1686), which prohibits discrimination on the basis of sex; (c) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. §794), which prohibits discrimination on the basis of handicaps; (d) the Age Discrimination Act of 1975, as amended (42 U.S.C. §§6101-6107), which prohibits discrimination on the basis of age; (e) the Drug Abuse Office and Treatment Act of 1972 (P.L. 92-255), as amended, relating to nondiscrimination on the basis of drug abuse; (f) the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 (P.L. 91-616), as amended, relating to nondiscrimination on the basis of alcohol abuse or alcoholism; (g) §§523 and 527 of the Public Health Service Act of 1912 (42 U.S.C. §§290 dd-3 and 290 ee 3), as amended, relating to confidentiality of alcohol and drug abuse patient records; (h) Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§3601 et seq.), as amended, relating to nondiscrimination in the sale, rental or financing of housing; (i) any other nondiscrimination provisions in the specific statute(s) under which application for Federal assistance is being made; and, (j) the requirements of any other nondiscrimination statute(s) which may apply to the application.

7. Will comply, or has already complied, with the requirements of Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (P.L. 91-646) which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal or federally-assisted programs. These requirements apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

8. Will comply, as applicable, with provisions of the Hatch Act (5 U.S.C. §§1501-1508 and 7324-7328) which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

9. Will comply, as applicable, with the provisions of the Davis-Bacon Act (40 U.S.C. §§276a to 276a-7), the Copeland Act (40 U.S.C. §276c and 18 U.S.C. §874), and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§327-333), regarding labor standards for federally-assisted construction subagreements.

10. Will comply, if applicable, with flood insurance purchase requirements of Section 102(a) of the Flood Disaster Protection Act of 1973 (P.L. 93-234) which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

11. Will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 (P.L. 91-190) and Executive Order (EO) 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in floodplains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972 (16 U.S.C. §§1451 et seq.); (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176(c) of the Clean Air Act of 1955, as amended (42 U.S.C. §§7401 et seq.); (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended (P.L. 93-523); and, (h) protection of endangered species under the Endangered Species Act of 1973, as amended (P.L. 93-205).

12. Will comply with the Wild and Scenic Rivers Act of 1968 (16 U.S.C. §§1271 et seq.) related to protecting components or potential components of the national wild and scenic rivers system.

13. Will assist the awarding agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. §470), EO 11593 (identification and protection of historic properties), and the Archaeological and Historic Preservation Act of 1974 (16 U.S.C. §§469a-1 et seq.).

14. Will comply with P.L. 93-348 regarding the protection of human subjects involved in research, development, and related activities supported by this award of assistance.

15. Will comply with the Laboratory Animal Welfare Act of 1966 (P.L. 89-544, as amended, 7 U.S.C. §§2131 et seq.) pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this award of assistance.

16. Will comply with the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. §§4801 et seq.) which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

17. Will cause to be performed the required financial and compliance audits in accordance with the Single Audit Act Amendments of 1996 and OMB Circular No. A-133, "Audits of States, Local Governments, and Non-Profit Organizations."

18. Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program.

| SIGNATURE OF AUTHORIZED CERTIFYING OFFICIAL | TITLE |
|---|---|
| APPLICANT ORGANIZATION | DATE SUBMITTED |

**Standard Form 424B (Rev. 7-97) Back**

**U.S. DEPARTMENT OF THE INTERIOR**
**CERTIFICATIONS FOR FEDERAL ASSISTANCE**

PART A: Certifications Regarding Debarment, Suspension and Other Responsibility Matters - Primary Covered Transactions. Applies to all grantees and cooperators.

This certification is required by the regulations implementing Executive Order 12549, Debarment and Suspension, 43 CFR Part 12, Section 12.510, Participants' responsibilities. The regulations were published as Part VII of the May 25, 1988 Federal Register (pages 19160-19211). For further assistance in obtaining a copy of the regulations, contact the issuing office.

(a) The prospective primary participant certifies to the best of its knowledge and belief, that it and its principals: (1) are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency; (2) have not within a 3-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; (3) are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and (4) have not within a 3-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

(b) Where the prospective primary participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

The prospective primary participant further agrees by submitting this proposal that it will include the following clause, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions (see Appendix A of Subpart D of 43 CFR Part 12):

PART B: Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transactions.

(a) The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

(b) Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

PART C: Certification Regarding Drug-Free Workplace. Alternate I. Applies to grantees other than individuals.

This certification is required by the regulations implementing the drug-free workplace requirements for Federal grant recipients under the Drug-Free Workplace Act of 1988 (43 CFR Part 12, Subpart D). A copy of the regulation is available from the issuing office.

A. The grantee certifies that it will or continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition; (b) Establishing an on-going drug-free awareness program to inform employees about (1) the dangers of drug abuse in the workplace; (2) the grantee's policy of maintaining a drug-free workplace; (3) any available drug counseling, rehabilitation, and employee assistance programs; and (4) the penalties that may be imposed upon employee for drug abuse violations occurring in the workplace;

(c) Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will (1) abide by the terms of the statement; and (2) notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying the agency, in writing, within ten calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to every grant officer or other designee on whose grant activity the convicted employee was working, unless the Federal agency has designated a central point for the receipt of such notices. Notice shall include the identification number(s) of each affected grant;

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted: (1) taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or (2) requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e) and (f).

B. The grantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific grant;

Place of Performance (Street address, city, county, state, zip code)

______________________________________________________

______________________________________________________

______________________________________________________

Check ___ if there are workplaces on file that are not identified here.

PART D: Certification Regarding Drug-Free Workplace. Alternate II. Applies to grantees who are individuals.

This certification is required by the regulations implementing the drug-free workplace requirements for Federal grant recipients under the Drug-Free Workplace Act of 1988 (43 CFR Part 12, Subpart D). A copy of the regulation is available from the issuing office.

(a) The grantee certifies that, as a condition of the grant, he or she will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the grant;

(b) If convicted of a criminal drug offense resulting from a violation occurring during the conduct of any grant activity, he or she will report the conviction, in writing, within 10 calendar days of the conviction, to the grant officer or other designee, unless the Federal agency designates a central point for the receipt of such notices. When notice is made to such a central point, it shall include the identification number(s) of each affected grant.

Part E: Certification Regarding Lobbying - Certification for Contracts, Grants, Loans, and Cooperative Agreements. Applies to recipients of awards exceeding $100,000.

This certification is required by Section 1352, title 31, U.S. Code, entitled "Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions."

**The undersigned certifies, to the best of his or her knowledge and belief, that:**

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify accordingly.
This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

As the authorized certifying official, I hereby certify that the above specified certifications are true.

______________________________________________________

Signature

______________________________________________________

Typed name and title

______________________________________________________

Applicant/Recipient

**Appendix D -- Schedule of Costs**

| **Professional** | **Amount** Oct-05 | Nov-05 | Dec-05 | Jan-06 | **Total** |
|---|---|---|---|---|---|
| Sandy Johnigan ($475/hr) | | | | | |
| **Fees** | $ 7,600.00 | $ 18,050.00 | $ 21,850.00 | $ 29,877.50 | $ 77,377.50 |
| **Travel Expenses** | | $ - | | | $ - |
| Bland & Associates CPA | | | | | |
| **Fees** | $ | 10,045.00 | $ 13,073.75 | $ 14,503.75 | $ 37,622.50 |
| **Travel Expenses** | | | $ - | $ - | $ - |
| | | | **Total** | | **$115,000.00** |

# Budget Information — Non-Construction Programs

OMB Approval No. 0348-0044

**Section A - Budget Summary**

| Grant Program Function or Activity (a) | Catalog of Federal Domestic Assistance Number (b) | Estimated Unobligated Funds: Federal (c) | Estimated Unobligated Funds: Non-Federal (d) | New or Revised Budget: Federal (e) | New or Revised Budget: Non-Federal (f) | New or Revised Budget: Total (g) |
|---|---|---|---|---|---|---|
| 1. Cooperative Agreement | | $ 115,000.00 | $ | $ | $ | $ 115,000.00 |
| 2. | | | | | | |
| 3. | | | | | | 0.00 |
| 4. | | | | | | 0.00 |
| 5. Totals | | $ 115,000.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 115,000.00 |

**Section B - Budget Categories**

| 6. Object Class Categories | Grant Program, Function or Activity (1) | (2) | (3) | (4) | Total (5) |
|---|---|---|---|---|---|
| a. Personnel | $ | $ | $ | $ | $ 0.00 |
| b. Fringe Benefits | | | | | 0.00 |
| c. Travel | | | | | 0.00 |
| d. Equipment | | | | | 0.00 |
| e. Supplies | | | | | 0.00 |
| f. Contractual | 115,000.00 | | | | 115,000.00 |
| g. Construction | | | | | 0.00 |
| h. Other | | | | | 0.00 |
| i. Total Direct Charges (sum of 6a-6h) | 115,000.00 | | | | 115,000.00 |
| j. Indirect Charges | | | | | 0.00 |
| k. **Totals** (sum of 6i and 6j) | 115,000.00 | | | | 115,000.00 |
| 7. Program Income | $ | $ | $ | $ | $ 0.00 |

Previous Edition Usable



Authorized for Local Reproduction

**SF-424A** (Rev. 4-92)
Prescribed by OMB Circular A-102

Appendix E

**Section C - Non-Federal Resources**

| (a) Grant Program | (b) Applicant | (c) State | (d) Other Sources | (e) Totals |
|---|---|---|---|---|
| 8. | $ | $ | $ | $ 0.00 |
| 9. | | | | 0.00 |
| 10. | | | | 0.00 |
| 11. | | | | 0.00 |
| 12. Total (sum of lines 8 - 11) | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

**Section D - Forcasted Cash Needs**

| | Total for 1st Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|---|
| 13. Federal | $ 115,000.00 | $ | $ | $ 0.00 | $ 0.00 |
| 14. Non-Federal | 0.00 | | | | |
| 15. Total (sum of lines 13 and 14) | $ 115,000.00 | $ | $ | $ 0.00 | $ 0.00 |

**Section E - Budget Estimates of Federal Funds Needed for Balance of the Project**

| (a) Grant Program | Future Funding Periods (Years) (b) First | (c) Second | (d) Third | (e) Fourth |
|---|---|---|---|---|
| 16. | $ | $ | $ | $ |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |
| 20. Total (sum of lines 16-19) | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

**Section F - Other Budget Information**

| 21. Direct Charges | 22. Indirect Charges |
|---|---|
| 23. Remarks | |

**FINANCIAL STATUS REPORT**

*(Long Form)*

*(Follow instructions on the back)*

| 1. Federal Agency and Organizational Element to Which Report is Submitted | 2. Federal Grant or Other Identifying Number Assigned By Federal Agency | OMB Approval No. **0348-0039** | Page of pages |
|---|---|---|---|

3. Recipient Organization (Name and complete address, including ZIP code)

| 4. Employer Identification Number | 5. Recipient Account Number or Identifying Number | 6. Final Report ☐ Yes ☐ No | 7. Basis ☐ Cash ☐ Accrual |
|---|---|---|---|

| 8. Funding/Grant Period *(See instructions)* From: (Month, Day, Year) | To: (Month, Day, Year) | 9. Period Covered by this Report From: (Month, Day, Year) | To: (Month, Day, Year) |
|---|---|---|---|

| 10. Transactions: | I Previously Reported | II This Period | III Cumulative |
|---|---|---|---|
| a. Total outlays | | | 0.00 |
| b. Refunds, rebates, etc. | | | 0.00 |
| c. Program income used in accordance with the deduction alternative | | | 0.00 |
| d. Net outlays *(Line a, less the sum of lines b and c)* | 0.00 | 0.00 | 0.00 |
| **Recipient's share of net outlays, consisting of:** e. Third party (in-kind) contributions | | | 0.00 |
| f. Other Federal awards authorized to be used to match this award | | | 0.00 |
| g. Program income used in accordance with the matching or cost sharing alternative | | | 0.00 |
| h. All other recipient outlays not shown on lines e, f or g | | | 0.00 |
| i. Total recipient share of net outlays *(Sum of lines e, f, g and h)* | 0.00 | 0.00 | 0.00 |
| j. Federal share of net outlays *(line d less line i)* | 0.00 | 0.00 | 0.00 |
| k. Total unliquidated obligations | | | |
| l. Recipient's share of unliquidated obligations | | | |
| m. Federal share of unliquidated obligations | | | |
| n. Total Federal share *(sum of lines j and m)* | | | 0.00 |
| o. Total Federal funds authorized for this funding period | | | |
| p. Unobligated balance of Federal funds *(Line o minus line n)* | | | 0.00 |
| **Program income, consisting of:** q. Disbursed program income shown on lines c and/or g above | | | |
| r. Disbursed program income using the addition alternative | | | |
| s. Undisbursed program income | | | |
| t. Total program income realized *(Sum of lines q, r and s)* | | | 0.00 |

| 11. Indirect Expense | a. Type of Rate *(Place "X" in appropriate box)* ☐ Provisional ☐ Predetermined ☐ Final ☐ Fixed | | | |
|---|---|---|---|---|
| | b. Rate | c. Base | d. Total Amount | e. Federal Share |

12. *Remarks: Attach any explanations deemed necessary or information required by Federal sponsoring agency in compliance with governing legislation.*

13. Certification: **I certify to the best of my knowledge and belief that this report is correct and complete and that all outlays and unliquidated obligations are for the purposes set forth in the award documents.**

| Typed or Printed Name and Title | Telephone (Area code, number and extension) |
|---|---|
| Signature of Authorized Certifying Official | Date Report Submitted April 19, 2006 |

Previous Edition Usable 269-104 Standard Form 269 (Rev. 7-97)

NSN 7540-01-012-4285 Prescribed by OMB Circulars A-102 and A-110

200-498 P.O. 139 (Face)

Appendix F
Page 1 of 2

FINANCIAL STATUS REPORT
(Long Form)

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0039), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE OFFICE OF MANAGEMENT AND BUDGET.**

Please type or print legibly. The following general instructions explain how to use the form itself. You may need additional information to complete certain items correctly, or to decide whether a specific item is applicable to this award. Usually, such information will be found in the Federal agency's grant regulations or in the terms and conditions of the award (e.g., how to calculate the Federal share, the permissible uses of program income, the value of in-kind contributions, etc.). You may also contact the Federal agency directly.

| Item | Entry |
|---|---|
| 1, 2 and 3. | Self-explanatory. |
| 4. | Enter the Employer Identification Number (EIN) assigned by the U.S. Internal Revenue Service. |
| 5. | Space reserved for an account number or other identifying number assigned by the recipient. |
| 6. | Check *yes* only if this is the last report for the period shown in item 8. |
| 7. | Self-explanatory. |
| 8. | Unless you have received other instructions from the awarding agency, enter the beginning and ending dates of the current funding period. If this is a multi-year program, the Federal agency might require cumulative reporting through consecutive funding periods. In that case, enter the beginning and ending dates of the grant period, and in the rest of these instructions, substitute the term "grant period" for "funding period." |
| 9. | Self-explanatory. |
| 10. | The purpose of columns, I, II, and III is to show the effect of this reporting period's transactions on cumulative financial status. The amounts entered in column I will normally be the same as those in column III of the previous report *in the same funding period*. If this is the first or only report of the funding period, leave columns I and II blank. If you need to adjust amounts entered on previous reports, footnote the column I entry on this report and attach an explanation. |
| 10a. | Enter total gross program outlays. Include disbursements of cash realized as program income if that income will also be shown on lines 10c or 10g. Do not include program income that will be shown on lines 10r or 10s.<br><br>For reports prepared on a cash basis, outlays are the sum of actual cash disbursements for direct costs for goods and services, the amount of indirect expense charged, the value of in-kind contributions applied, and the amount of cash advances and payments made to subrecipients. For reports prepared on an accrual basis, outlays are the sum of actual cash disbursements for direct charges for goods and services, the amount of indirect expense incurred, the value of in-kind contributions applied, and the net increase or decrease in the amounts owed by the recipient for goods and other property received, for services performed by employees, contractors, subgrantees and other payees, and other amounts becoming owed under programs for which no current services or performances are required, such as annuities, insurance claims, and other benefit payments. |

| Item | Entry |
|---|---|
| 10b. | Enter any receipts related to outlays reported on the form that are being treated as a reduction of expenditure rather than income, and were not already netted out of the amount shown as outlays on line 10a. |
| 10c. | Enter the amount of program income that was used in accordance with the deduction alternative. |
| Note: | Program income used in accordance with other alternatives is entered on lines q, r, and s. Recipients reporting on a cash basis should enter the amount of cash income received; on an accrual basis, enter the program income earned. Program income may or may not have been included in an application budget and/or a budget on the award document. If actual income is from a different source or is significantly different in amount, attach an explanation or use the remarks section. |
| 10d, | e, f, g, h, i and j. Self-explanatory. |
| 10k. | Enter the total amount of unliquidated obligations, including unliquidated obligations to subgrantees and contractors.<br><br>Unliquidated obligations on a cash basis are obligations incurred, but not yet paid. On an accrual basis, they are obligations incurred, but for which an outlay has not yet been recorded.<br><br>Do not include any amounts on line 10k that have been included on lines 10a and 10j.<br><br>On the final report, line 10k must be zero. |
| 10l. | Self-explanatory. |
| 10m. | On the final report, line 10m must also be zero. |
| 10n, | o, p, q, r, s and t. Self-explanatory. |
| 11a. | Self-explanatory. |
| 11b. | Enter the indirect cost rate in effect during the reporting period. |
| 11c. | Enter the amount of the base against which the rate was applied. |
| 11d. | Enter the total amount of indirect costs charged during the report period. |
| 11e. | Enter the Federal share of the amount in 11d. |
| Note: | If more than one rate was in effect during the period shown in item 8, attach a schedule showing the bases against which the different rates were applied, the respective rates, the calendar periods they were in effect, amounts of indirect expense charged to the project, and the Federal share of indirect expense charged to the project to date. |

SF-269 Back (Rev. 7-97)

# Exhibit D

# Filed Separately Under Seal