**CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON v. UNITED STATES,** Case No. 02-126L (CFC) and Case No. 02-CV-02040 (D.D.C.)

## AGREEMENT GOVERNING ADR PROCEEDINGS

I. Scope. This Agreement Governing ADR Proceedings ("ADR Agreement") is entered into by and between the Confederated Tribes of the Warm Springs Reservation of Oregon (the "Tribe") and the United States of America (the "U.S.") (each a "party" and collectively, "the parties").

The parties are currently engaged in the following lawsuits:

1. Confederated Tribes Of The Warm Springs Reservation of Oregon v. United States, Case No. 02-1261 (CFC) ("CFC Case")

2. Confederated Tribes Of The Warm Springs Reservation of Oregon v. Norton et al, Case No. 02-02-CV-02040 (D.D.C.) ("D.D.C. Case")

The CFC Case is an action for money damages that has been bifurcated into two phases: Phase I covers the Tribe's trust funds mismanagement claims, and Phase II covers the Tribe's non-monetary asset mismanagement claims. The D.D.C. Case is an action for injunctive relief that seeks a court ordered historical accounting of the Tribe's trust funds and assets.

The parties have embarked upon, and are currently engaged in, alternative dispute resolution ("ADR") proceedings regarding Phase I of the CFC Case and regarding the claim for an historical accounting of the Tribe's trust funds in the D.D.C. Case. The scope of this ADR Agreement is to govern all alternative dispute resolution proceedings for Phase I of the CFC Case and for the funds historical accounting claim in the D.D.C. Case. The scope of this ADR Agreement does not include any other ADR proceedings between the parties that may have occurred, or that may occur in the future, including any such proceedings regarding Phase II of the CFC Case or regarding a claim for an historical accounting of the Tribe's non-monetary trust assets.

II. Purpose. The parties enter into this Agreement to promote the settlement of this case through, among other things, frank, in-depth settlement communications between themselves and with Senior Judge Edward J. Leavy, of the Ninth U.S. Circuit Court of Appeals, who is serving as a mediator between the parties. The ADR process includes: (a) accountants' analysis of specified funds and accounts to quantify potential damage amounts and/or amounts in dispute pursuant to a mutually agreed upon methodology, (b) analysis of investment and interest earnings by the parties' chosen consultants, (c) an exchange of position papers on legal issues relevant to the United States' alleged liability, (d) after completion of (a), (b), and (c), the parties

will participate in a mediation with Judge Leavy to attempt to resolve the CFC Case Phase I claims and the trust funds historical accounting claim .

III. Participants in the ADR Process.

A. Parties. The Parties to the ADR proceedings shall be the Tribe and the U.S.

B. Mediator. The Mediator in the ADR proceedings is Senior Judge Edward J. Leavy of the United States Court of Appeals for the Ninth Circuit. The Mediator has no authority to decide the case or any issues in the case and is not acting as an advocate or attorney for any party.

IV. The ADR Claims.

The ADR process will focus on resolution of the CFC Phase I Claims and the D.D.C. Case Funds Historical Accounting Claim described below (collectively the "ADR Claims"). The Tribe has selected the ADR Claims from its CFC Phase I claims and from the D.D.C. Case The parties aver that this ADR process will sufficiently prepare the parties to permit a negotiated resolution of all the Tribe's Phase I claims in the CFC Case and the trust funds historical accounting claim in the D.D.C. Case. The possibility of engaging in an ADR process regarding the Tribe's Phase II non-monetary trust asset mismanagement claims in the CFC Case will be discussed by the parties upon the conclusion of the ADR process set forth in this ADR Agreement.

A. CFC Phase I Claims.

The overall period addressed for each Phase I claim (to the extent relevant to that claim) is August 13, 1946 to present.

1. Productivity Claims: The productivity claim area contains two grounds: (a) failure to pay statutory interest; and (b) failure to obtain a maximum prudent investment return.

2. Lag Time Claims: The lag time claim area consists of two grounds: (a) Deposit Lag Time (lost interest due to lag time between actual receipt of deposits and the posting of the deposit to the account) and (b) Disbursement Lag Time (lost interest due to the posting of the withdrawal of the funds from the account prior to the negotiation of the check with the U. S. Department of the Treasury).

3. Disbursements Claims: The disbursement claim area contains three grounds: (a) Unappropriated disbursements (without required Congressional appropriation); (b) Improper disbursements; and (c) Unsupported disbursements (unreconciled).

B. D.D.C. Case Funds Historical Accounting Claim.

The only claim in the D.D.C. Case that is included in the ADR Claims is the Tribe's claim for a full historical accounting of it trust funds. All other claims in the D.D.C. Case,

including the claim for an historical accounting of the Tribe's non-monetary assets, are not included in the ADR Claims and are not included in this ADR process.

V. Acknowledgements.

A. The parties make no admission of fact or law, responsibility, fault, or liability by entering into and participating in the ADR process, by entering into this ADR Agreement, by performing any component of the ADR process, or by seeking approval for any proposed settlement developed pursuant to this ADR Agreement.

B. The parties recognize that the parties' counsel and other participants in these ADR proceedings do not possess the necessary authority to settle this lawsuit, and that any settlement proposal developed in these ADR proceedings will not be binding on any party unless and until it has been reduced to writing and signed by appropriate persons who have or have obtained the requisite authority to enter into such an agreement.

VI. ADR Proceedings. The parties have followed, and will follow an ADR process consisting of four components intended, when completed, to provide the basis for settlement of the Tribe's CFC Phase I trust fund mismanagement claims and the Tribe's D.D.C. trust funds historical accounting claim. In the first component, the parties and their retained consultants and experts will analyze specified accounts to quantify potential damage amounts or amounts in dispute pursuant to a mutually agreed upon methodology ("the Accounting Methodology Implementation"). In the second component, the parties will task their respective consultants to analyze the investment and interest income associated with certain specified accounts to review the acceptability of the investment and interest income credited to the Tribe and to quantify potential damage amount or amounts in dispute ("the Investment Analysis"). In the third component, the parties will exchange position papers and meet to discuss their views on various legal issues regarding trust funds management which are relevant to the United States' alleged liability for the Tribe's CFC Case Phase I claims ("the Legal Position Papers"). After completion of the first three components, and based on the results of that work, the parties agree to exchange offers to settle the Tribe's CFC Phase I trust fund mismanagement claims and to participate in a mediation in a good faith effort to settle those claims (the "Settlement Mediation").

A. The Accounting Methodology Implementation.

1. Description of Accounting Methodology. A full description of the accounting methodology to be implemented is contained in the document entitled "*Warm Springs Tribe v. United States* Agreed Upon ADR Methodologies Trust Fund Mismanagement Claims," a copy of which is attached hereto as Exhibit 1. (Exhibit 1 is incorporated herein.)

2. Performance of the Work. The parties agree that the work implementing the accounting methodologies shall be performed as follows in accordance with a schedule mutually agreeable to the parties. It is agreed that work scheduled for completion prior to the execution of this document has already occurred in a timely fashion.

B. Investment Analysis. The parties have each retained their own consultant to evaluate the productivity of the funds at issue. Those consultants have prepared reports which have been shared with the other party. Each consultant has also prepared a preliminary rebuttal report and shared that with the other party. At a mediation session with Judge Leavy on December 15, 2005, the consultants met with the parties, presented the results of their work and discussed the analyses with the parties on a confidential basis.

C. ADR Position Papers. In consultation with the Mediator, the Tribe and U.S. will exchange statements of their position under agreed-upon schedules regarding designated legal issues. In consultation with the Mediator, the Tribe and U.S. shall meet at agreed-upon times, dates, and locations to discuss the strengths and weaknesses of the parties' respective positions regarding designated legal issues. The parties acknowledge that the following list of issues may be modified as the ADR Accounting Methodology, Investment Analysis and the parties' investigations proceed.

At present, these issues include:

1. Claim Preclusion Issue Regarding Pre-1981 productivity claims – Certain productivity claims of the Tribe for periods prior to 1981 have been settled in an earlier Court of Federal Claims lawsuit. The issue is the extent, if any, that this earlier case and its settlement bars any of the CFC Phase I Claims.

2. Disbursement Lag Time Claims Issue – The Tribe's disbursement lag time claim asserts that the Tribe is entitled to earn interest on disbursements made by check until the checks clear the U.S. Treasury. The issue is whether or not the Tribe is legally entitled to some or all of such interest.

3. Special Deposit Accounts (SDAs) – Productivity claims, lag time claims and disbursement claims have been asserted for all special deposit accounts, which the U.S. asserts represent, in material part, advance payments for timber stumpage fees that are transferred to the Tribe as timber is cut. The Tribe claims ownership of any interest earned on such special deposit accounts prior to the point when timber is cut. The U.S. asserts that interest is not allocable to the Tribe until the timber is actually cut and value is determined. The issue is whether or not the Tribe is entitled to this special deposit account interest.

4. IMPL / SDA Interest prior to 1982 – Prior to 1982, the parties understand that it was the policy of the government to post interest on SDAs to an Indian Monies Proceeds of Labor (IMPL) account for government use and not to SDAs. Legislation was enacted and the regulations were changed to include the distribution of remaining IMPL balances and to begin

posting interest to SDA accounts. The issue is whether or not the Tribe is entitled to recover damages for the earlier interest from such SDA accounts that were used by the government and were not in the 1982 IMPL balances turned over to the Tribe.

5. IIM interest. The issue is whether U.S. was legally required, prior to 1994, to invest or award interest on the Tribe's IIM accounts.

VII. Modification of the ADR Agreement. If the parties determine that modification to the ADR process contained in this ADR Agreement is necessary, the parties may, by mutual agreement, amend this ADR Agreement, but such amendment must be in writing signed by both parties. Provided, however, that absent such modification by amendment, the parties shall act in good faith to abide by all terms of this ADR Agreement, as written, including implementation of the Accounting Methodology within the scheduled time periods.

VIII. Confidentiality Agreement Provisions.

A . Definition. As used in this Confidentiality Agreement section, the term "settlement communications" means any communications made, exchanged, or provided by the Tribe, U.S., and their agents, employees, experts, consultants, attorneys, or members of the Tribe, and the Mediator in, or for purposes of, these ADR proceedings whether orally, in writing, electronically, telephonically, or otherwise, including, without limitation, all statements, communications, offers, conduct, findings or conclusions, written submittals, reports, exhibits, appraisals, demonstrative aids, documents, and any part thereof, where such information is designated specifically as "confidential" by either stating that such information is confidential (in the context of verbal communications) or by marking such information as "Confidential" (in the context of written communications), provided that neither party may designate the communications of the other party and their agents, etcetera as confidential.

B. General Agreement of Confidentiality.

It is agreed that:

1. All settlement communications are confidential and shall be deemed compromise negotiations under Rule 408 of the Federal Rules of Evidence. In addition, no party shall disclose any settlement communications, except as herein provided, as compelled by court order, or as otherwise required by law.

2. Settlement communications shall not be used for any purpose outside of these ADR proceedings, including any pending or future proceeding in the Court of Federal Claims or any other court or forum. The parties agree that they shall have no right to use any settlement communications obtained or generated by the Mediator or any other party.

3. The parties shall not, in any subsequent proceedings other than these ADR proceedings – including proceedings in the CFC Case and the D.D.C. Case – subpoena, or seek in any way, the testimony of, or settlement communications provided to, the Mediator.

4. The parties agree that no actions taken, or statements made in the course of these ADR proceedings will be asserted to be the basis for any claim of waiver of the attorney client, work product or deliberative process privileges, or the waiver of the confidentiality of business information.

C. Exceptions to the General Agreement of Confidentiality.

It is agreed that:

1. Information or evidence that is otherwise discoverable or admissible shall not be rendered immune from discovery or inadmissible as a result of its use in settlement communications.

2. The parties may enter into written agreements resolving some or all of the claims or enter factual or procedural stipulations based on agreements made in connection with these ADR proceedings.

3. The parties recognize that the United States is subject to the Freedom of Information Act, 5 U.S.C. § 552, and its associated regulations and may receive a request for information or documents thereto. Except to the extent otherwise permitted by the Freedom of Information Act or other applicable federal law, the parties acknowledge that this Agreement does not prevent the disclosure of any settlement communication which is required to be made public by applicable law.

4. The parties reserve the right to utilize settlement communications as necessary to confidentially inform their respective decision makers with respect to any proposed settlement that results from these ADR proceedings.

5. Within 30 days after conclusion of these ADR proceedings, regardless of whether it results in final disposition of Phase I of the CFC Case or of the D.D.C. Case, the parties shall destroy or return to the originating party all written settlement communications disclosed by the originating party that have been marked as a "SETTLEMENT COMMUNICATION (SUBJECT TO CONTROL UNDER PARA.VIII.C.5)" unless the parties agree otherwise in writing.

6. Each party has used consultants and employees to assist in this ADR (the "ADR consultants"). In the event that the either the CFC Case or the D.D.C. Case, or any part thereof, proceed to further litigation and a party offers any of the ADR consultants as a witness, either as a fact or expert witness, the opposing party agrees that the documents created and materials relied upon by such witness in the course of their engagement in this case shall be

discoverable and admissible as permitted under the ordinary rules of discovery and admissibility, notwithstanding that such materials may have been created or offered for use in this ADR, excepting however that each party agrees to not seek in any way the testimony of, or settlement communications by or to the testifying ADR consultant: (a) arising from work conducted by the consultant after December 15, 2005 through the completion of these ADR proceedings, and (b) any oral settlement communication made at or during any meeting including both parties or phone call between the two parties, including meetings and phone calls attended solely by the parties' respective ADR consultants.

D. Survival of Confidentiality Provisions. The confidentiality provisions of this ADR Agreement shall remain in full force and effect without regard to whether any legal actions or issues arising out of the case are settled or concluded by final judgment or otherwise, and shall survive termination of these ADR proceedings.

E. Confidentiality Acknowledgements. Before participating in these ADR proceedings in this case, each party's respective participating agents, officers, employees, representatives, experts, and consultants shall personally review this Agreement and execute and date an acknowledgment as follows:

> I acknowledge that I have read the Agreement Governing ADR Proceedings that was entered into by the Tribe and the U.S. I understand and agree to comply with the Confidentiality Provisions contained therein.

For purposes of this paragraph, "participating in these ADR proceedings in this case" means preparing, reviewing, evaluating, or analyzing settlement proposals or positions or records provided by the other party in these ADR proceedings. The parties' respective attorneys of record shall retain all such acknowledgments and shall provide copies thereof to opposing counsel upon request.

F. Motion for Court Order: The parties have filed a joint motion in the CFC Case requesting that the Court enter a Protective Order of Confidentiality Re: ADR Proceedings containing provisions substantively the same as those in this section VIII. Regardless of whether or not the Court enters the Protective Order of Confidentiality Re: ADR Proceedings as requested, the parties hereby agree to be bound by the terms of the Confidentiality Agreement Provision in this Agreement.

IX. Effective Date. This Agreement shall become effective upon being signed by the parties. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

Case 1:02-cv-02040-RCL Document 48 Filed 10/17/2006 Page 8 of 35

X. Execution.

IN WITNESS WHEREOF, the parties have executed this Agreement in separate original counterparts, which shall be deemed a single agreement as of the date of the last signature.

CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON

By: ______________________________ Date: ______________________________

UNITED STATES OF AMERICA

By: ______________________________ Date: ______________________________

# *WARM SPRINGS TRIBE V. UNITED STATES*

## AGREED-UPON ADR METHODOLOGIES

## TRUST FUND MISMANAGEMENT CLAIMS

**OVERVIEW** .......... 3
**THE THREE CLAIMS AREAS** .......... 4
**METHODOLOGIES** .......... 5
**PRODUCTIVITY CLAIMS** .......... 5
I. POL/Award Trust Funds .......... 5
August 13, 1946 to September 1964 .......... 5
October 1964 to March 1981 .......... 6
April 1981 to September 1992 .......... 7
October 1992 to May 2005 .......... 8
II. Tribal IIM and Special Deposit Accounts .......... 9
August 13, 1946 to May 2005 .......... 9
III. IMPL .......... 10
August 13, 1946 to September 1964 and April 1981 until paid out .......... 10
**LAG TIME CLAIMS** .......... 11
**DEPOSIT LAG TIME** .......... 11
I. POL/Award Trust Funds .......... 11
August 13, 1946 to June 1972 .......... 11
July 1972 to September 1992 .......... 12
October 1992 to May 2005 .......... 13
II. Tribal IIM and Special Deposit Accounts .......... 14
August 13, 1946 to May 2005 .......... 14

**DISBURSEMENT LAG TIME** .................... **15**
I. POL/Award Trust Funds .................... 15
August 13, 1946 to May 2005 .................... 15

II. Tribal IIM and Special Deposit Accounts .................... 16
August 13, 1946 to May 2005 .................... 16

**DISBURSEMENT CLAIMS** .................... **17**
I. POL/Award Trust Funds .................... 17
August 13, 1946 to June 1972 .................... 17

July 1972 to September 1992 .................... 18

October 1992 to May 2005 .................... 19

II. Tribal IIM and Special Deposit Accounts .................... 20
August 13, 1946 to May 2005 .................... 20

III. IMPL .................... 21
August 13, 1946 until paid out .................... 21

FOR SETTLEMENT PURPOSES ONLY

## OVERVIEW

This document represents the agreed-upon methodologies for quantifying amounts in dispute for the three claim areas identified below. Within each claim area, and for various time periods, methodologies are presented for each of the three account types (to the extent relevant to that claim):

**POL/Awards (Tribal Trust Fund Accounts and Award Accounts)**

**IIM (Individual Indian Monies) Tribal and Special Deposit Accounts**

**IMPL (Indian Monies Proceeds of Labor Accounts)**

The overall period addressed for each claim (to the extent relevant to that claim) is August 13, 1946 to May 2005. To the extent that methodologies are different for different portions of the overall period the discussion under each of the three account types is divided into separate periods.

Within each period, for each claim and account type, there is an identification of the documents to be used, when available, and a description of the methodology for that period. This proposal does not address the legal basis for the claims. Its focus is solely on proposed methodologies for quantifying the amounts in dispute for each claim, within each period, for each type of account. The methodology will be performed for the transactions summarized in Attachment II.

### ACCOUNTS

A list of accounts subject to these procedures is included in Attachment I. The listed accounts fall into one of the following categories:

- **Tribal Trust Accounts** – These are Tribal accounts that have been maintained and accounted for within the Tribal Trust Fund in the accounting system. They include Judgment funds with restricted use and Proceeds of Labor (POL) accounts with no restriction.

- **Tribal IIM Accounts** – These are Tribal funds maintained as part of the Individual Indian Monies (IIM) Trust Fund in the accounting system. Assets were managed as part of the IIM investment pool.

- **Special Deposit Accounts (SDAs)** -- SDAs are holding accounts, also maintained in the IIM Fund, established for a number of reasons to collect and hold deposits pending distribution to account holders or return to the payee, depending on the purpose of the account. As they apply to the Tribe these accounts are primarily used for advanced payments on timber contracts and/or proceeds from sales of rights of way.

- **IMPL Accounts** –These accounts have been maintained in the Tribal and IIM pooled trust funds and represent government established accounts to collect miscellaneous revenue.

## THE THREE CLAIMS AREAS

**1. Productivity Claims**: The productivity claim area consists of two claims: (1) Failure to pay Statutory Interest (4%); and (2) Failure to obtain maximum investment return.

**2. Disbursements Claims**: The disbursement claim area consists of three claims: (1) Unappropriated disbursements (without required Congressional appropriation); (2) Improper disbursements; and (3) Unsupported disbursements (unreconciled).

**3. Lag Time Claims**: The lag time claim area consists of two claims: (1) Deposit Lag Time (lost interest due to lag time between actual receipt of deposits and the posting of the deposit to the account) and (2) Disbursement Lag Time (lost interest due to the posting of the withdrawal of the funds from the account before the check clears the U.S. Treasury Department account on which it is drawn.)

# METHODOLOGIES

## PRODUCTIVITY CLAIMS

### POL/AWARD TRUST FUNDS

**Time Period: August 13, 1946 to September 1964**

**A. Documents Needed**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency) or the Treasury Cash Cards, sufficient to show actual Investment Earnings, provided in electronic format ("Electronic Transaction Report").

2. Documents identifying Statutory Interest requirements and calculations for POL/Award Trust Funds during this time period.

3. Documents identifying authorized investments during the period.

4. Published historical records of rates of return for authorized investments identified in point A3.

**B. Methodology to Determine Amounts in Dispute**

1. Use Electronic Transaction Report to compile the actual investment earnings recorded for each POL account during the period August 13, 1946 to September 1964.

2. Each party provides one or more "benchmark" yield rate(s) that might have been achieved for authorized investments based on historical rates of return identified in point A4.

   NOTE: Benchmark yields will be established by financial experts considering market conditions, liquidity needs, investment policies, etc. The established benchmarks will be applied to all funds available for investment (i.e., account fund balance).

3. Use Electronic Transaction Report to compute the Investment Earnings that might have been achieved based on the benchmark yield rate (s) established in point B2.

   a. Disregard the original recorded investment earnings for each period.

   b. Compute the average annual outstanding balance for each year.

   c. Compute investment earnings that might have been earned on the average annual outstanding balance calculated in B3b using the benchmark yield rate(s) determined in B2.

d. Add the Investment Earnings computed in B3c to the outstanding balance and carry forward the adjusted balance as the beginning balance for the next year, thus compounding the effect of the newly calculated hypothetical earnings for subsequent years.

e. Repeat steps B3b through B3d for each of the remaining years.

f. Compile the Investment Earnings that might have been achieved for the period August 13, 1946 to September 1964.

4. Compute the differences between the actual investment earnings recorded, as compiled in point B1, and the calculated Investment Earnings that might have been achieved as compiled in point B3f.

5. Compute the additional Investment Earnings that should have been earned on amount determined in B4 from October 1964 through present.

6. Total results calculated in points B4 and B5.

**Time Period: October 1964 to March 1981**

**A. Documents Needed.**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency) or the Treasury Cash Cards, sufficient to show actual Statutory Interest received on POL/Award Trust Funds during this period, provided in electronic format ("Electronic Transaction Report").

2. Documents identifying Statutory Interest requirement and calculations for POL/Award Trust Funds during this time period.

**B. Methodology to Determine Amounts in Dispute**

1. Use Electronic Transaction Report to compile the Statutory Interest recorded for each POL account during the period October 1964 to March 1981.

2. Use Electronic Transaction Report to compute the Statutory Interest that should have been achieved based on the Statutory Interest documented in A2 above.

NOTE: Procedure/calculation is the same as August 1946 to September 1964 using statutory rates as opposed to benchmark rates.

a. Disregard the original recorded Statutory Interest for each period.

b. Compute the average annual outstanding balance for each year.

c. Compute Statutory Interest that should have been earned on the average annual outstanding balance calculated in B2b using the Statutory Interest documented in A2.

d. Add the Statutory Interest computed in B2c to the outstanding balance and carry forward the adjusted balance as the beginning balance for the next year, thus compounding the effect of the newly calculated earnings for subsequent years.

e. Repeat steps B2b through B2d for each of the remaining years.

f. Compile the Statutory Interest that should have been earned for the period October 1964 to March 1981.

3. Compute the difference between the actual Statutory Interest recorded, as compiled in point B1, and the Statutory Interest that should have been earned computed in point B2f.

4. Compute the additional Statutory Interest that should have been earned on amount determined in B3 from April 1981 through present.

5. Total results calculated in points B3 and B4.

**Time Period: April 1981 to September 1992**

**A. Documents Needed.**

1. Summary and Detail of Trust Funds Reports, equivalent electronic information or other transaction records if these documents do not provide adequate information about date posted and transaction description. ("Electronic Transaction Report").

2. MoneyMax Investment Reports sufficient to provide information about investment processes.

3. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs' independent accountants or by accounting staff at the Agency or the Tribe.

4. Arthur Andersen LLP Agreed-Upon Procedures engagement ("AA Reconciliation Project") investment testing working papers and supporting documents, including electronic Microsoft Access database found at WMS007637.

5. Obtain the documents used to create the investment yield for all tribes as described in AA Reconciliation Project report, see WS-027883.

6. Documents identifying authorized investments for each period (if different from prior period).

7. Published historical records of annual yields for authorized investments.

8. Historical records for the rate on one day market-based certificates (ie the "overnighter" rate) from 1985 forward.

**B. Methodology to Determine Amounts in Dispute**

1. Use Electronic Transaction Report to compile the actual investment earnings and average investment balances. Use Electronic Transaction Report to also (or test AA workpapers) segregate Unallotted ("Uninvested") funds from invested funds.

2. Compare results of average balances as computed in AA Reconciliation Project report to actual as compiled in B1 above. Investigate significant variances . [To be determined]. Note that answer to B2 may affect the reconciliation.

3. Each party shall establish a benchmark investment yield rate(s) based on published rates for the authorized investments identified in point A8.

4. Use Electronic Transaction Report to compute the investment earnings that might have been achieved based on the benchmark yield rates established in point B3. Follow same calculation methodology as applied for the time period August 13, 1946 to September 1964 description B3a through B3f.

5. Compute the differences between the actual investment earnings recorded, as compiled in point B1, and the calculated investment earnings that might have been achieved as compiled in point B4.

6. Compute the additional investment earnings that should have been earned on amount determined in B5 from October 1992 through present.

7. Total results calculated in points B5 and B6.

**Time Period: October 1992 to May 2005**

**A. Documents Needed.**

1. Summary and Detail of Trust Funds Reports, Sungard OmniTrust Reports, TFAS Reports, equivalent electronic information or other general transaction records if these documents do not provide adequate information about date posted and transaction description ("Electronic Transaction Report").

2. MoneyMax Investment Reports sufficient to provide information about investment processes.

3. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs' independent accountants or by accounting staff at the Agency or the Tribe.

4. Documents identifying authorized investments for the period, if different from prior period.

5. Published historical records of annual yields for authorized investments.

6. Historical records for the rate on one day market-based certificates (ie the "overnighter" rate) from 1985 forward.

**B. Methodology to Determine Amounts in Dispute**

1. Review changes in investment policies and Government procedures during this period. Adjust methodology, as applicable. The following procedures assume no adjustment to the methodology.

2. Each party will establish a benchmark investment yield rate(s) based on published rates of authorized investments in point A5.

3. Use Electronic Transaction Report to compute the investment earnings that might have been earned based on the benchmark yield rate (s) in point B2 (Follow same calculation methodology as applied in POL/Award Trust Funds August 13, 1946 to September 1964 B3a through B3f).

4. Compute the difference between the actual investment earnings recorded, from schedules in B3, and the calculated investment earnings that might have been earned as compiled in point B3.

5. Compute the additional Investment Earnings that might have been earned on amount determined in B4 from October 1992 through present (This computation should be included in calculations in B4 since the computation is through the present).

6. Total results calculated in B4 and B5.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. Form 5-796 Individual Indian Tribal and selected Special Deposit Account ("IIM Accounts") Cards, provided in electronic format ("Electronic Transaction Report").

2. IIM Accounts printout or electronic database from IRMS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe, through 2005). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

3. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs independent accountants or by accounting staff at the Agency or the Tribe.

**B. Methodology to Determine Amounts in Dispute**

1. Use the Electronic Transaction Report to compile actual investment earnings (statutory interest only from October 1964 to March 1981) received, if any, for some periods. Special Deposits Accounts will be reviewed to determine the investment return and/or Statutory Interest accrued and paid to the IMPL accounts.

2. For purposes of ADR project, only select Tribal IIM and Special Deposit accounts will be reviewed, which at present are listed in Attachment I.

3. Review the comparison of IIM balances (as reported in the Annual Reports prepared for Warm Springs by its auditor) to the IIM Tribal and Special Deposits balances identified and summarized in point B1 above. (Note: See Non Investment Disbursements claim methodology. This comparison and investigation of any differences was performed in that test.)

4. Use Electronic Transaction Report to (The same calculation methodology as applied in POL/Award Trust Funds August 13, 1946 to September 1964 as follows:

   a. For August 13, 1946 to September 1964 and April 1981 to May 2005 compute investment earnings that might have been received based on the authorized investment benchmark yield rates applied in the POL/AWARD work.

   b. For the October 1964 to March 1981 time period compute Statutory Interest that might have been received based on statutory rates during the period as determined above in POL/AWARD.

5. Compute the difference between actual investment earnings recorded, as compiled in B1 and investment earnings or Statutory Interest that might have been earned as compiled in B4a and B4b.

6. Total results calculated in B5 and B6.

**IMPL**

**Time Period: August 13, 1946 to September 1964 and April 1981until paid out**

**A. Documents Needed**

1. IMPL General Ledger Cards (maintained by the BIA-Area), SunGuard OmniTrust, SEI TFAS reports or other records that provide transaction detail similar to the manual General Ledger cards, provided in electronic format ("Electronic Transaction Report")..

**B. Methodology to Determine Amounts in Dispute**

1. Use the Electronic Transaction Report to compile actual investment earnings (Statutory Interest only from October 1964 to March 1981) received, if any, for some periods. Special Deposits Accounts will be reviewed to determine the investment return and/or Statutory Interest accrued and paid to the IMPL accounts. (Follow same calculation methodology as applied in POL/Award Trust Funds August 13, 1946 to September 1964 B3a through B3f).

2. Compute the difference between actual investment earnings, compiled in B1, and investment earnings that might have been received as compiled in the POL/AWARD work.

3. Compute the additional investment earnings that might have been received on amount determined in B2 through present.

4. Total results calculated in B2 and B3.

**<u>LAG TIME CLAIMS</u>**

**DEPOSIT LAG TIME**

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to June 1972**

**A. Documents Needed**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency), provided in electronic format ("Electronic Transaction Report").

2. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

3. Semi-annual Treasury interest appropriation warrants.

4. Deposit ticket (SF-219) (Similar to SF-215 Deposit Tickets in later years). This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Perform methodology for all transactions summarized in Attachment II.

2. Locate the corresponding collection document, as described in A2, for each receipt and record the "date received" in the database of transactions, as determined from the document. Priority for the date selected will be as follows:

a. The "receipt date" if clearly indicated

b. The earliest date subsequent to the check date (if indicated). This could be indicated by the stamp date of the processed collections voucher, the date the collection voucher was prepared or the date the collection voucher was signed (NOTE: Check date will also be captured for consideration of excessive days between the check date and collection date selected).

c. If no receipt date or check date can be identified (and amount was not a wire transfer), the date will be considered undetermined and not used for determination of the average. The parties will review the frequency of indeterminate dates in the interim results, and decide if the results can be reliably used for ADR.

3. Subtract the date received (listed according to B2) from the posted date in the Electronic Transaction Report.

4. Determine the number of days of "lag time" between the date received and the date deposit was posted. Calculate an average lag time.

5. Compare the average lag time to acceptable lag times proposed by each party based on existing policy and an agreed-upon reasonable deposit time lag. Determine the average variance lag time.

6. Apply the "average variance lag time" findings to the universe of all collections, excluding account transfers with no interest effect.

7. Calculate the investment earnings impact of the average variance lag time using the rate (or rates) determined during the Productivity test above.

8. Compute the additional investment earnings on amount determined in B7 from the date of loss through present using the rate calculated in the Productivity tests above.

**Time Period: July 1972 to September 1992**

**A. Documents Needed**

1. Coopers & Lybrand Report Reconciliation Report.

2. Coopers & Lybrand Reconciliation Working Papers.

3. AA Reconciliation Project working papers for the Deposit Lag Time Test.

4. The General Ledger Control Card (maintained by the BIA-Area Office or Agency) and Summary and Detail of Trust Funds Reports provided in electronic format, ("Electronic Transaction Report").

5. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

6. SF-215 Deposit Ticket. This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Determine if there is sufficient basis for the Summary of Deposit Lag Time Results for the Tribe as reported in the AA Reconciliation Project report, WS-027922, if not, revise the results based on examination of the documents collected. Concentrate the majority of the effort on the "0" Days categories.

2. Determine the numbers of "0" Days listed that are due to insufficient documentation to determine the receipt date.

3. Derive an appropriate surrogate date for those documents without adequate date support. For example, use actual transaction results for those transactions where dates are subject to verification.

4. Compare the average lag time to acceptable lag times supplied by the parties. Determine the average variance lag time

5. Apply the "average variance lag time" findings to the universe of all collections, excluding account transfers with no interest effect.

6. Calculate the investment return impact of the average variance lag time using the rate (or rates) determined during the Productivity test above.

7. Compute the additional investment earnings on amount determined in B7 from the date of loss through present using the rate calculated in the Productivity tests above.

**Time Period: October 1992 to May 2005**

**A. Documents Needed**

1. Summary and Detail of Trust Funds Reports from 1992 through March 31, 1995, OmniTrust Reports with account balances (040 Reports) - monthly reports held by the OST or in storage on their behalf at Lenexa or in Albuquerque by OTR, or SEI's TFAS reports (monthly) for the Warm Springs Tribal trust accounts. All information shall be provided electronically. ("Electronic Transaction Report")

2. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

3. SF-215 Deposit Ticket. This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Select a sample of collection transactions from the Electronic Transaction Report (see Attachment II). Perform procedures as listed in the August 13, 1946 to June 1972 time period.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. Tribal IIM Ledger Card. provided in electronic format, and, if available, copies of the Tribal IIM and selected Special Deposit Account ledger cards. All information shall be provided electronically. ("Electronic Transaction Report")

2.

3. IIM Account printout from IRMS-IIM and TFAS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe through February 28, 1999 and thereafter from the TFAS-IIM transaction detail.). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

4. Field Receipts, Schedule of Collections, Mail Logs, Collection Vouchers, Bills for Collection DI-1040 or Receipt Registers which included the date received, or other documentation of date received at the agency or in the field.

5. SF-215 Deposit Ticket. This document is only necessary if the General Ledger and Field Receipts cannot be compared directly to the posted transactions (i.e., to complete the audit trail).

**B. Methodology to Determine Amounts in Dispute**

1. Test the method for interest calculation from August 13, 1946 to 1989. Determine if any changes should be made to the methodology described below.

2. Perform procedures as listed in the August 13 1946 to June 1972 time period for POL/Award Trust Funds accounts for the selected transactions.

   NOTE: As described in step B1, in applying the calculation of interest for the period prior to 1989 consider the interest distribution method within the IIM Fund in calculating the interest impact of the lag time (i.e., end of month balance as opposed to average balances would affect the calculated interest effect of the lag time).

**DISBURSEMENT LAG TIME**

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. The General Ledger Control Card (maintained by the BIA-Area Office or Agency), Summary and Detail of Trust Funds Reports from April 1972 through March 31, 1995, OmniTrust Reports with account balances (040 Reports) - monthly reports from April 1, 1995 through February 28, 1999 held by the OST or in storage on their behalf at Lenexa or in Albuquerque by OTR, or SEI's TFAS reports from March 1, 1999 to present (monthly) for the Warm Springs Tribal trust accounts. All information will be electronic. ("Electronic Transactions Report")

2. SF-1166 document with the confirmation date stamped (or handwritten) when the check(s) were issued, if confirmed copy is available (should be found in the BIA or OST records) and the related SF-1034 and/or Tribal Resolution for all payments selected for testing.

3. Treasury record of date each check was negotiated (e.g., Treasury's microfilm or digital image of negotiated checks sent to Federal Records Centers and those retrieved from Federal Records Centers for any of the years from August 13, 1946 to April 21, 2000; and also digital images of ALC 0699 checks paid after April 21, 2000), the limited availability of which may result in the parties proposing a change in the methodology.

4. Treasury Appropriation Ledgers (Main accounts), Subsidiary Treasury Ledgers of monies appropriated (i.e., moved to disbursement status) and semi-annual Treasury interest appropriation warrants, the limited availability of which may result in the parties proposing a change in the methodology.

5. Records in the Office of Trust Fund Management (OTFM) Activity Tracking System (OATS) related to payments made by OTFM (related to ALC 0699 for checks related to the Warm Springs Tribal disbursements) , the limited availability of which may result in the parties proposing a change in the methodology.

**B. Methodology to Determine Amounts in Dispute**

1. Identify the document identification number, transaction date and dollar amount for selected transactions dating from March 1987 to May 2005, found on the following accounting statements: General Ledger Control Card, the Detail of Trust Funds Report, the OmniTrust Report, or the SEI TFAS Report for each disbursement from August 13, 1946 to May 2005 for the Warm Springs Tribe.

FOR SETTLEMENT PURPOSES ONLY

2. Locate the corresponding SF-1166 for each disbursement selected in B1 and document any variance noted between the "confirmed disbursement date" from the box (found in the top right part of the document) and the posted date. Capture any such variances in the database.

3. Using Treasury Department documents, establish the date the check actually was cashed or wired from the Tribe's or other Treasury account.

4. Calculate the number of days of "lag time" between the 3 dates (i.e.- 1) the date the disbursement transaction was recorded by the BIA/OST; 2) the date the check or wire transfer actually occurred; and, 3) the date the check was actually cashed and the funds withdrawn from the U.S. Treasury. Calculate an average "lag times" between the three dates.

5. Apply the "lag time" findings to the identified universe of disbursements.

6. Calculate the investment earnings impact of the lag time lost using the days determined in B5 and the rate calculated in the Productivity tests above. Prepare separate calculations for the two different lag times determined in points B4 and B5.

7. Compute the additional investment earnings on amount determined in B6 through present using the rate calculated in the Productivity tests above.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed - related to disbursements authorized and processed for payment by the Indian Service Special Disbursing Agent (ISSDA)**

1. Tribal IIM Ledger Card, provided electronically. ("Electronic Transaction Report")

2. IIM Account printout from IRMS-IIM and TFAS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe through February 28, 1999 and thereafter from the TFAS-IIM transaction detail.). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

3. Treasury record of date checks cleared Treasury (Available from March 1987) the limited availability of which may result in the parties proposing a change in the methodology.

4. Final check registers for the Treasury checks issued by the ISSDA, or check carbons, or daily disbursement reports.

**B. Methodology to Determine Amounts in Dispute**

1. Test the method for interest calculation or investment yield, as applicable, from August 13, 1946 to 1989. Determine if any changes should be made to the methodology described below.

2. Perform methodology as described for POL accounts for the period March 1987 thru May 2005,

**DISBURSEMENT CLAIMS**

**POL/AWARD TRUST FUNDS**

**Time Period: August 13, 1946 to June 1972**

**A. Documents Needed**

1. General Ledger Control Card (maintained by the BIA – Area Office or Agency) or the US Treasury Cash Ledger Card and Allotment Ledgers, if available, provided electronically. ("Electronic Transaction Report")

2. Annual Appropriation Statutes.

3. US Treasury Annual Report of Receipts, Expenditures and Fund Balances.

4. Tribal bank records, financial reports and associated working papers Tribal Council resolutions, and other tribal records relevant to disbursements.

5. SF-1166 document with the confirmation date stamped (or handwritten) when the check(s) were issued, if confirmed copy is available (should be found in the BIA or OST records) and the related SF-1034 and/or Tribal Resolution for all payments selected for testing.

**B. Methodology to Determine Amounts in Dispute**

1. Use the Electronic Transaction Report to identify disbursements by appropriation and activity code for all disbursements summarized in Attachment II.

2. Using the Annual Appropriation Statutes, identify the amount of and the purpose for appropriated funds.

3. Compare the schedule developed in B2 above to the amounts disbursed as described in B1 above.

4. Identify disbursements that for purposes of ADR will or will not be reviewed. The identification process will be a collaborative effort between the parties. Examples of disbursements that will be reviewed include:

a. Appropriations including, but not limited to, Health, Agency & Administrative Costs, Law & Order and Education.

b. Per Capita distributions may be reviewed for reasonableness but will not be challenged for disbursement vouching. In addition payments made to the Tribe will be considered for the universe of transactions not challenged.

5. Examine selected high dollar disbursement vouchers for consistency with the purposes enumerated in the Appropriation Act.

6. Examine selected transactions and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

7. Compile a list of challenged and or unsupported disbursements based on the work performed in B4, B5 and B6.

8. Compute the investment earnings on the amount determined at B7 through present using the rate calculated in the Productivity tests above.

9. Total results in B7 and B8.

**Time Period: July 1972 to September 1992**

**A. Documents Needed**

1. General Ledger Control Card (maintained by the BIA – Area Office or Agency) or the US Treasury Cash Ledger Card and the Allotment Ledger, if available, provided electronically. ("Electronic Transaction Report")

2. Summary and Detail of Trust Funds Reports.

3. AA Reconciliation Project non-investment disbursement testing working papers and supporting documents, including electronic Microsoft Access database found at WMS007637.

4. DOI working papers and supporting documents for non-investment disbursement reconciliation procedures (continuation of work not completed in the AA Reconciliation Project).

5. Tribal bank records, financial reports and associated working papers Tribal Council resolutions, and other tribal records relevant to disbursements, as needed.

**B. Methodology to Determine Amounts in Dispute**

1. Examine Arthur Andersen supporting documents for the Warm Springs disbursement test

2. Review working paper support for the transactions reported on in the AA Reconciliation Project Report to conclude on the appropriateness of AA Reconciliation Project assigned Disbursement Codes.

Case 1:02-cv-0204υ-RCL Document 48 Filed 10/17/2υυ6 Page 27 of 35



3. Conclude on appropriateness of Disbursement Codes for reconciliation purposes (Using the work previously performed by AA review disbursements for any that will be challenged as to purpose as described in POL/AWARD 1946 to 1971 above).

4. Examine selected transactions and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

5. Compute the Investment Earnings on amount determined in B4 from the date of the transaction through present for those transactions with mutually selected disbursement codes.

6. Total results from B4 and B5.

**Time Period: October 1992 to May 2005**

**A. Documents Needed**

1. Summary and Detail of Trust Funds Reports (through March 31, 1995), OmniTrust Report from 1995 to 1999, or SEI TFAS reports (monthly) for Warm Springs Tribal Trust Accounts (From 1999). All information provided electronically. ("Electronic Transaction Report")

2. Relevant disbursement documentation.

**B. Methodology to Determine Amounts in Dispute**

1. Identify disbursements that for purposes of ADR will or will not be reviewed. The identification process will be a collaborative effort between the parties. Examples of disbursements that will be reviewed include:

   a. Appropriations including, but not limited to, Health, Agency & Administrative Costs, Law & Order and Education.

   b. Per Capita distributions may be reviewed for reasonableness but will not be challenged for disbursement vouching. In addition payments made to the Tribe will be considered for the universe of transactions not challenged.

2. Examine selected transactions (challenged and high dollar amounts) and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

3. Compile a list of challenged and or unsupported disbursements based on the work performed in B1 and B2.

4. Compute the Investment Earnings on the amount determined at B3 through present using the rate calculated in the Productivity tests above.

5. Total results in B3 and B4.

**TRIBAL IIM AND SPECIAL DEPOSIT ACCOUNTS**

**Time Period: August 13, 1946 to May 2005**

**A. Documents Needed**

1. Form 5-796 Individual Indian Tribal and selected Special Deposit Account ("IIM Accounts") Cards, provided in electronic format. ("Electronic Transaction Report")

2. IIM Account printout from IRMS-IIM and TFAS-IIM with the transaction activity (for the period in mid-1980's when the IRMS-IIM system actually began to be used for the Warm Springs Tribe through February 28, 1999 and thereafter from the TFAS-IIM transaction detail). (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record)

3. IIM Disbursement Request forms and payment documentation for each selected payment or group of checks. Annual Operating Statement as produced by Area or Central Office (if found may reduce the need for this selected disbursement information).

4. Final check registers for the Treasury checks issued by the ISSDA.

5. Warm Springs Annual Financial Reports and related working papers maintained by Warm Springs independent accountants or by accounting staff at the Agency or the Tribe.

6. Tribal bank records , financial reports and associated working papers Tribal Council resolutions, and other tribal records relevant to disbursements, as needed.

**B. Methodology to Determine Amounts in Dispute**

1. For purposes of mediation, only material IIM Tribal accounts and their successors will be reviewed. For example, C-68 is expected to be one of the key accounts reviewed for this case.

2. Identify selected Special Deposit Accounts to be tested for purposes of mediation (see Attachment I).

3. Identify disbursements that for purposes of mediation will or will not be reviewed. The identification process will be a collaborative effort between the parties. Examples of disbursements that will be reviewed include:

   a. Appropriations including, but not limited to, Health, Agency & Administrative Costs, Law & Order and Education.

b. Per Capita distributions may be reviewed for reasonableness but will not be challenged for disbursement vouching. In addition payments made to the Tribe will be considered for the universe of transactions not challenged.

4. Compare the IIM balances as reported in the Annual Reports prepared for Warm Springs by its auditor to the IIM Tribal and Special Deposits balances identified and summarized in B1 above. Investigate any differences over $100,000.

5. Examine selected transactions (challenged and high dollar amounts) and the source documents, and assign a disbursement code indicating the level of supporting documentation for each selected transaction.

6. Compile a list of challenged and or unsupported disbursements based on the work performed in B3, B4 and B5.

7. Compute the Investment Earnings on the amount determined at B6 from the date of loss through present using the rate calculated in the Productivity tests above.

8. Total results in B6 and B7.

**IMPL**

**Time Period: August 13, 1946 until paid out**

**A. Documents Needed**

1. IMPL General Ledger Cards (maintained by the BIA-Area or Agency), provided in electronic format. ("Electronic Transaction Report")

2. Electronic records such as Summary and Detail of Trust Funds or, if not available, copies of General Ledger Detail Ledger reports or other records that provide transaction detail similar to the manual General Ledger cards. (Also called "Electronic Transaction Report" with the expectation that the data from A1 will be merged with this electronic data to provide one electronic record.)

3. IMPL Disbursement Request forms and payment documentation for each selected payment or group of checks. Annual Operating Statement as produced by Area or Central Office (if found may reduce the need for this selected disbursement information).

**B. Methodology to Determine Amounts in Dispute**

1. Prepare an electronic summary of the IMPL General Ledger Control Cards. Merge electronic records when available with the electronic summary prepared for the prior years.

2. Create a summary of the categories of payments from IMPL.

3. Identify disbursements that for purposes of mediation will not be challenged. For example payments made to the Tribe will be considered for the universe of transactions not challenged.

4. Examine selected high dollar disbursement vouchers to determine if the amount was paid for goods or services for the tribe with an objective of assigning a disbursement code.

5. Calculate amount in dispute for categories of disbursements identified for payment of goods or services other than for tribal interests.

6. Compute the investment earnings on amount determined in B5 through present.

7. Total results in B5 and B6.

**Warm Springs v. United States**

**ADR Methodologies**

**Account Listings**

Attachment I

| Account Title | Manual Ledger: Tribal Account Number: | Manual Ledger: Alternate Account Number: | Finance System/IRMS | OMNI/TFAS |
|---|---|---|---|---|
| **IMPL** | | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.660 | 8500 | | |
| IMPL WARM SPRINGS AGENCY Interest | | | | |
| REPAIR AND MAINTENANCE BUILDING AND UTILITIES | 14X7200.660.729 | | | |
| IMPL WARM SPRINGS AGENCY GARAGE | 14X7200.600.751 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661.186 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661.393 | | | |
| IMPL WARM SPRINGS AGENCY | 14X7200.661.861 | | | |
| IMPL WARM SPRINGS AGENCY TELEPHONE | 14X7200.707 | | | |
| IMPL WARM SPRINGS AGENCY HOSPITAL | 14X7200.737 | | | |
| IMPL WARM SPRINGS AGENCY TELEPHONE | 14X7200.752 | | | |
| **Tribal Trust** | | | | |
| | | | 7290 | |
| | | | 7790 | |
| PROCEEDS OF LABOR | 14X7472 | | 7472 | PL7472704 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION - REVENUE RESERVE FUND | | | | PL7546708 |
| PROCEEDS OF LABOR (FIRE SUPPRESSION) | 14X7472.392 | | | |
| INTEREST AND ACCRUALS OF INTEREST PROCEEDS OF LABOR | 14X7972 | | 7972 | |
| WARM SPRINGS TRIBE - 9351-69-1 | | | 93512600 | JA9351691 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 98512600 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 93512629 | |
| WARM SPRINGS TRIBE - 9351-29-5 | | | 98512629 | JA9351295 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 94172600 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 99172600 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 94172601 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 99172601 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 94172621 | |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 98512612 | |
| WARM SPRINGS TRIBE - 9351-10-5 | | | 98512610 | JA9351105 |
| CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION | | | 99172621 | JA9417211 |
| WARM SPRINGS TRIBES - MATTERS MCQUINN | | | | JA1070696 |
| **Tribal IIM** | | | | |

**Warm Springs v. United States** **Attachment I**

**ADR Methodologies**

**Account Listings**

| | | | | |
|---|---|---|---|---|
| CONFEDERATED TRIBES OF WARM SPRINGS | 145T006800 (Starts 5/19/81) | C 68 | | |
| CONFEDERATED TRIBES OF WARM SPRINGS | 145T006900 (Starts 10/9/84) | C 69 | | |
| CONFEDERATED TRIBES OF WARM SPRINGS [GRANT MONIES] | 145T007000 (Starts 10/26/76) | | | |
| WARM SPRINGS FOREST PRODUCTS INDUSTRIES | 145T007200 (Starts 11/17/83) | W 720 | | |
| **Special Deposit Accounts** | | | | |
| TRIBAL FORESTRY HOLDING ACCOUNT FEES | SD-75 | | | 145S007500 |
| DEPOSITS - OTHER ALLOTTEES - FORESTRY HOLDING ACCT 14X8563 A/R CONTRIBUTIONS | SD-87 | | | |
| PINTO SALVAGE LOGGING UNIT (MCQUINN STRIP) | SD-100 | | | |
| WARM SPRINGS LUMBER CO. SCHOOLIE UNIT LOGGING CONTRACT | SD-110 | | | |

Attachment II

**Warm Springs Tribe v. United States**
**ADR Methodology**

## SCOPES

### General

In order to determine reasonable scopes for the ADR methodology, CD&L has analyzed the database of transactions they created from a combination of available electronic data and keyed manual ledgers for years where electronic data are not available. Although for certain accounts, the data is not yet complete, as certain ledgers have not yet been located, the data set is substantially complete for most of the relevant accounts. The data are sufficiently complete to identify data characteristics relevant to project objectives, to set initial scopes and to begin searching for transaction records. CD&L is continuing to complete the data set for incomplete accounts and will identify additional transactions based on established thresholds (scopes), and/or recommend adjusting thresholds as appropriate based on the final data set. The most significant change is expected in the IMPL accounts. Attachment I is a current matrix illustrating the current status of the ledger search and keyed manual ledger data.

Based on CD&L's analysis of the data there is a large concentration of dollar activity in a manageable number of transactions. The focus of the claims is monetary, and the Warm Springs Tribe (Tribe) has expressed an interest in focusing on obtaining dollar coverage in the accounts. The largest impact in valuing these claims will be on high dollar transactions. Attached are summaries of account transactions for each class of account by dollar value illustrating the concentration of account activity (Attachment II).

The recommended scopes result in substantial coverage of all relevant accounts and claims. This approach assumes that transactions not included in the document testing phase will be included in the calculation of amounts in dispute relating to lag times applying the average lag times determined from tested items.

In summary, not considering the transaction documents readily available on the Andersen CD's (i.e. 1972 through 1992) this approach will require the location of source documents for approximately 1,560 additional transactions. The transactions selected have been identified as receipts or disbursements based on data characteristics, however if through document research, these transactions are found to be transfers, they will be eliminated from our testing as these are specifically excluded in the ADR methodology.

Recommended scopes are summarized below.

### Productivity Claim –

Approach does not involve sampling but is an overall test designed for full coverage of investment earnings

Attachment II

**Receipt Lag Time Claim –**

**Tribal Trust Accounts**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Pre 1972 | Trans. >= $100K | 26 | $ 18,355,141 | 97% |
| 1973 - 1992 | All Andersen and D&T trans. | 1,295 | 276,850,627 | 95% |
| 1993 – 2005 | Trans. >= $100K | 133 | 115,600,113 | 99% |

**Tribal IIM and IMPL**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Earliest date through 2005 | Trans. >= $100K | 417 | $184,002,498 | 93% |

**Special Deposit Accounts**

**Phase I** – Results of Phase I scope will be evaluated to determine potential impact to the Tribe prior to proceeding with phase two

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $100K | 57 | $7,171,529 | 39% |

**Phase II** – To be initiated if deemed necessary after completion of phase I

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $50K < $100K | 78 | $5,228,531 | 28% |

**Total Phase I and II**

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $100K | 135 | $12,400,060 | 67% |

**Disbursement Lag and Disbursement Claim –**

Attachment II

**Tribal Trust Accounts**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Pre 1972 | Trans. >= $100K | 56 | $32,260,467 | 95% |
| 1973 - 1992 | All Andersen and CD&L trans. | 432 | $278,215,886 | 99.9% |
| 1993 – 2005 | Trans. > $100K | 221 | $100,265,096 | 94% |

**Tribal IIM and IMPL**

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Earliest date through 2005 | Trans. > =$100K | 453 | $168,087,399 | 79% |

**Special Deposit Accounts**

**Phase I** – Results of Phase I scope will be evaluated to determine potential impact to the Tribe prior to proceeding with phase two

| Time period | Scope | Transactions | Dollars | Coverage |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $100K | 65 | $14,801,566 | 69% |

**Phase II** – To be initiated if deemed necessary after completion of phase I

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $50K < $100K | 53 | 3,847,136 | 18% |

**Total Phase I and II**

| | | | | |
|---|---|---|---|---|
| Term of selected accts. | Trans. >= $50K | 118 | $18,648,702 | 87% |